**Dolly Kyle BROWNING and Direct Outstanding Creations Corporation, Appellants**

v.

**William Jefferson CLINTON, et al., Appellees**

No. 01–5050.

United States Court of Appeals, District of Columbia Circuit.

Argued April 5, 2002.

Decided June 11, 2002.

Rehearing Denied Aug. 1, 2002.

---

Larry Klayman argued the cause and
filed the briefs for appellants.

David E. Kendall argued the cause for appellee William Jefferson Clinton, et al. With him on the brief were Allen P. Waxman, Kevin Hardy, Bruce Lindsey, appearing pro se, and William C. Oldaker.

John D. Aldock argued the cause and filed the brief for appellee Robert S. Bennett.

Floyd Abrams and Landis C. Best were on the brief for appellee Jane Mayer and Advanced Magazine Publishers Inc.

Before: EDWARDS, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

In this appeal, we review the district court's Rule 12(b)(6) dismissal of eight common and federal law claims against former President Clinton, two of his lawyers, one of his aides, *The New Yorker*, and a journalist. Construing the complaint liberally and giving appellant the "benefit of all inferences that can be derived from the facts alleged," *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994), we affirm as to all appellees except Mr. Clinton; with respect to Mr. Clinton, we affirm the dismissal of six claims and reverse two.

## I.

This case involves appellant Dolly Kyle Browning's "longstanding friendship" with former President Clinton—a friendship she alleges "included an extramarital, sexual relationship"—and her "semi-autobiographical novel" in which the female protagonist has a long-standing extramarital affair with the governor of a southern state. Am. Compl. ¶¶ 15, 20. Browning copyrighted her novel in 1988 and sent it to Warner Books, where an editor "en-couraged [her] to continue to work on [it]." *Id.* ¶ 22. Thereafter, Browning charges, Clinton and the other appellees engaged in a scheme to prevent publication of her book and defame her. According to the amended complaint, the scheme involved the following:

In 1992, Browning's own brother, allegedly at Clinton's direction, telephoned to "warn[ ] [Browning], 'if you cooperate with the media we will destroy you.'" *Id.* ¶ 32. Clinton's brother also "threaten[ed] [her]" by phone. *Id.* ¶ 33. The following year, appellee Bruce Lindsey, then serving as Deputy White House Counsel, "threatened ... Browning by telling her sister[,] 'we've read your sister's book and we don't want it published.'" *Id.* ¶ 38.

In 1994, Browning and Clinton met at their thirtieth high school reunion where, according to Browning, Clinton "apologized to [her] for the threat that had been made against her." *Id.* ¶ 41. Shortly thereafter, Browning's sister and Lindsey, acting as intermediaries, reached an "understanding" about what Browning could say: She "was. permitted to say publicly that she and Clinton had a thirty-three year relationship that from time to time included sex," but "agreed not to tell the true story" and "not to use ... the 'A words' ... adultery and affair"; Clinton agreed "not [to] tell any lies about [her]." *Id.* ¶ 44 (internal quotation marks omitted).

Browning retained a literary agent in the summer of 1995. Later that year, *Esquire* magazine published an article about Browning and her book, and in early 1996, *Publisher's Weekly* reported that Browning was "ready to go public in a big way via the book business[,] ... assuming, that is, that a publisher bites. This month, [Browning's literary agent] will begin shopping around a bombshell *roman à clef* that could knock *Primary Colors* right out

of the headlines." *Id.* ¶ 47 (internal quotation marks omitted) (first alteration in original). In the end, however, Browning received no "positive responses, offers to publish, or contracts from any of the publishers that she contacted." *Id.* ¶ 55. Appellant Direct Outstanding Creations Corporation, a business created by Browning's husband, subsequently "acquired ... rights to ... the manuscript ... [but] has not been able to sell [those] rights to ... any publisher[ ]." *Id.* ¶ 56.

Appellee *The New Yorker* ran an article in 1997 by appellee Jane Mayer attributing comments to publisher Alfred S. Regnery about "a memoir by a putative Presidential mistress." *Id.* ¶ 51 (internal quotation marks omitted). According to the article, although "[i]t seemed plausible ... that [such] a memoir ... would find a home at Regnery [Publishing Co.][,]" Regnery said he "wouldn't touch [the book] with a ten-foot pole" because it wasn't "particularly newsworthy" and was "far below [Regnery's] standards." *Id.* (internal quotation marks omitted). Browning claims that she never sent her manuscript to Regnery, and that Regnery never made these statements.

In January 1998, Clinton, in connection with his deposition in the Paula Corbin Jones litigation, produced a handwritten memo summarizing his high school reunion conversation with Browning. The memo, which Clinton testified he and appellee Marsha Scott, a White House aide, prepared several days after the reunion, states that when Clinton "pointed out that [Browning's book] wasn't true, [Browning] said[,] 'well, I'll say it's just fiction, just a story[,]' and that she needed the money and she didn't care if it hurt me or the presidency, that others had made money and she felt abandoned." *Id.* ¶ 69 (internal quotation marks omitted). In his deposition, Clinton explained that after writing the first part of the memo, he gave it to Scott, who read it and added her own notes. *Id.* ¶ 73. Scott's portion reports that Browning "repeatedly" stated that "her story was not true but ... she was angry and needed money." *Id.* ¶ 74 (internal quotation marks omitted). *Time* later published excerpts from the memo.

In March 1998, Jones, in opposition to Clinton's motion for summary judgment in that litigation, filed a ninety-page brief and 600 pages of exhibits, among which were statements from several witnesses, including a four-page affidavit from Browning describing her alleged affair with Clinton. Appellee Robert S. Bennett, Clinton's attorney, appeared on CNN and described Jones's filing as "scurrilous." *Id.* ¶ 80 (internal quotations omitted). At a press conference later that month, Bennett called Jones's "700–page filing"

> little more than a web of deceit and distortions.... Despite the plaintiff's ... insistence on using her last filing to dump into the media every piece of garbage they can get before the court, we will not respond in kind to that. Despite their vicious and false attacks, our filing focuses on the weaknesses of the plaintiff's case *and her witnesses* .... Because they dumped so much garbage .... we had to move to strike it and to present substantial evidence ... to rebut that salacious material.

*Id.* ¶ 81.

Based on the foregoing, Browning asserts eight common and federal law claims: (1) tortious interference with prospective business opportunity (against all appellees); (2) disparagement of property (against *The New Yorker* and Mayer); (3) defamation (against Clinton, Scott, and Bennett); (4) "false light" invasion of privacy (against Clinton, Scott, and Bennett); (5) intentional infliction of emotional dis-

tress (against Clinton, Lindsey, Scott, and Bennett); (6) civil RICO (against Clinton and Lindsey); (7) *Bivens* liability for violation of the First Amendment (against Clinton and Lindsey); and (8) civil conspiracy (against all appellees). Concluding that Browning failed to state a claim with respect to each count and denying leave to amend, the district court dismissed the complaint with prejudice under Federal Rules of Civil Procedure 12(b)(6) and 15(a). Browning appeals.

## II.

■■■ A Rule 12(b)(6) motion tests the legal sufficiency of a complaint: dismissal is inappropriate unless the "plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Reviewing de novo, *Moore v. Valder*, 65 F.3d 189, 192 (D.C.Cir.1995), we accept the plaintiff's factual allegations as true and construe the complaint "liberally," "grant[ing] plaintiff[ ] the benefit of all inferences that can be derived from the facts alleged," *Kowal*, 16 F.3d at 1276. At the Rule 12(b)(6) stage, we do not assess "the truth of what is asserted or determin[e] whether a plaintiff has any evidence to back up what is in the complaint." *ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 467 (D.C.Cir.1991). As the Supreme Court reiterated in a case decided after the district court dismissed this case, Federal Rule of Civil Procedure 8 requires "simply [that] ... 'the defendant [give] fair notice of what the plaintiff's claim is and the grounds upon which it rests.' This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, ——, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (quoting *Conley*, 355 U.S. at 47, 78 S.Ct. 99). That

said, we accept neither "inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint," nor "legal conclusions cast in the form of factual allegations." *Kowal*, 16 F.3d at 1275; *cf.* 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 347–48 (2d ed.1990) (explaining that Rule 12(b)(6) dismissal is appropriate where the allegations contradict the claim asserted, e.g., where the allegations in an action for negligence showed that the plaintiff's own negligence was the sole proximate cause of the injury).

■■■ With these standards in mind, we begin with Browning's allegation that appellees "intentionally ... [and] maliciously ... interfered with" her business opportunity to publish her novel. Am. Compl. ¶ 91. To survive a motion to dismiss on this claim, Browning must plead "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Bennett Enters. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C.Cir.1995). The first element—business expectancy—must be "commercially reasonable to anticipate." *Whelan v. Abell*, 953 F.2d 663, 673 (D.C.Cir.1992) (internal quotation marks and citation omitted). Although Browning's allegation that she "had a reasonable expectation" of selling her book to a publisher, Am. Compl. ¶ 88, might, standing alone, fall short, she also alleges not only that a Warner Books editor "encouraged" her to continue working on the book, *id.* ¶ 22 (appellees mischaracterize Warner's response as an unequivocal "reject[ion]," Clinton Appellees' Br. at 4), but also that she received favorable press coverage in the *Esquire* and

*Publisher's Weekly* articles. Indeed, the latter described her novel as a "bombshell" that "could knock *Primary Colors* right out of the headlines.'" Am. Compl. ¶ 47. Reading the complaint liberally in Browning's favor and bearing in mind that discovery and summary judgment motions, not Rule 12(b)(6) dismissals, are the appropriate vehicles for weeding out unmeritorious claims, *see Swierkiewicz*, 534 U.S. at ——, 122 S.Ct. at 998, we think these allegations, though thin, could support an inference that it was "commercially reasonable [for Browning] to anticipate" selling the book. *Whelan*, 953 F.2d at 673 (internal quotation marks and citation omitted). We certainly understand how the district court could have concluded that the lack of responses from publishers "contradicted" the reasonableness of any such expectation, *Browning v. Clinton*, No. 98–1991, slip op. at 15 (D.D.C. Feb. 8, 2001), but Browning theorizes that no one responded *because* "Clinton, acting individually and through various agents, ... threaten[ed] ... potential publishers," Am. Compl. ¶ 50.

Insisting that we should nevertheless affirm the dismissal of the tortious interference claim, three appellees—Clinton, Lindsey, and Scott—argue that Browning failed to plead another element of the claim, i.e., causation. It "defies logic," they say, to conclude that Clinton and others caused publishers "with a wide range of political beliefs" to reject the book. Clinton Appellees' Br. at 6. At the Rule 12(b)(6) stage, however, we must give Browning the benefit of all inferences and confine our analysis to the facts alleged. The amended complaint neither identifies publishers she contacted nor characterizes their "political beliefs." Whether a triable issue of fact exists regarding her allegation that "potential publishers" failed to respond positively due to "threat[s]" from

Clinton and his "agents" is a question for summary judgment.

We are equally unpersuaded by these appellees' argument that Browning failed to plead still another element, i.e., intentional interference. Browning cannot rely on her allegation that Clinton and his "agents" "threaten[ed] ... potential publishers," they say, because in failing to specify statements, publishers, or times, the allegation is too "conclusory." *Id.* at 5. Though extremely general and based only "on information and belief," Am. Compl. ¶ 50, the allegation satisfies Rule 8 as to Clinton (like the parties, we read the word "agents," when used in connection with alleged threats to publishers, to include neither Lindsey nor Scott nor any other appellee). The allegation gives "fair notice of what [Browning's] claim is and the grounds upon which it rests." *Swierkiewicz*, 534 U.S. at ——, 122 S.Ct. at 997 (internal quotation marks and citation omitted). By signing the complaint, moreover, Browning's counsel affirmed (on pain of sanctions) that he made "reasonable inquiry" into the facts supporting the complaint. *See* 5 WRIGHT & MILLER, § 1224, at 205 (explaining that pleading "on information and belief" is appropriate unless special pleading requirements apply or the information is within the plaintiff's knowledge, and noting the relationship between this permissive standard and Rule 11(b)'s requirement that the attorney who signs the pleadings affirms having made "reasonable inquiry" into the allegations).

These three appellees also argue that Browning cannot rely on the alleged threats to intimidate her into not publishing her story because her claim requires conduct that induced third parties—here, potential publishers—to decline a business relationship. The Restatement of Torts, upon which appellees rely, actually defines tortious interference more broadly, includ-

ing conduct that "prevent[s] the [plaintiff] from acquiring or continuing the prospective relationship" *in addition to* conduct that "induc[es] or otherwise caus[es] a third person not to enter into or continue the prospective relation." RESTATEMENT (SECOND) OF TORTS § 766B (1977). The amended complaint, however, alleges that after (and therefore despite) the threat Browning made concerted efforts to sell her book—thus contradicting any basis for her claim other than interference with third parties. Although the amended complaint's allegations against Clinton and Scott are not limited to actions directed at Browning, this is not the case as to Lindsey. The only allegations against him are that he threatened Browning and, on Clinton's behalf, negotiated the "understanding" with her. We will therefore affirm the dismissal of this claim against Lindsey.

■■■ The claim against Scott also fails, but on statute of limitations grounds. The amended complaint alleges that in 1994, Scott added notes to the memo describing Browning's encounter with Clinton at their high school reunion, and that Scott showed those notes to Clinton—conduct Browning characterizes as defamatory, and which forms the sole basis for her tortious interference claim against Scott. This tortious interference claim is therefore "intertwined" with Browning's defamation claim. *See Mittleman v. United States,* 104 F.3d 410, 415–17 (D.C.Cir.1997) (holding that a claim is "intertwined" with another claim when they are based on the same underlying facts). When a cause of action with no prescribed statute of limitations is "intertwined" with one having a prescribed limitations period, District of Columbia courts apply the prescribed period. *See id.* at 415–16. In the District of Columbia, tortious interference with business expectancy claims have no prescribed statute of limitations, so we must apply the one-year statute for defamation. *See* D.C. CODE § 12–301(4) (West 2001). Because Scott's conduct occurred more than a year before Browning filed her complaint, we will affirm the dismissal of the tortious interference claim against Scott. By contrast, the tortious interference claim against Clinton is not "intertwined" with Browning's defamation claim. Browning alleges that Clinton and his unidentified "agents" intentionally interfered with her business opportunity through conduct *other than defamation*—including by threatening publishers.

■■■ Appellee Bennett urges us to affirm the dismissal of Browning's tortious interference claim against him because his CNN and press conference statements, the only conduct Browning alleges he engaged in, could not have "hindered her ability to publish her book." Appellee Bennett's Br. at 12. Even given the liberal reading owed pleadings, we agree. Made two years after Browning and her agent contacted publishers, Bennett's comments focused on what he called "salacious," "scurrilous," and "deceit[ful]" filings by Jones. Am. Compl. ¶¶ 80, 81. Those filings included a Browning affidavit describing her alleged relationship with Clinton. But even if a listener familiar with the circumstances of the *Jones* case could infer that Bennett's language applied to Browning, *see infra* p. 247, their timing and content make the necessary causal inference "unsupported by the facts set out in the complaint." *Kowal,* 16 F.3d at 1275. We will therefore affirm the dismissal of the tortious interference claim against Bennett.

■■■ The final two appellees, *The New Yorker* and Jane Mayer, argue that Browning cannot show that Mayer's article "interfered with Browning's longstanding and unsuccessful prior efforts to publish her novel ... [since] 1988," pointing out

that the article "profiled a publisher[,] . . . did not focus on Browning or her novel[,] [and] . . . did not even mention Browning or the novel by name." *The New Yorker* Appellees' Br. at 13. Although we think these appellees overstate their case when they characterize Browning's efforts as "unsuccessful . . . since 1988"—after all, the Warner Books editor "encouraged" her, Am. Compl. ¶ 22—we agree that in view of the content of Mayer's article, the relationship between the article and any publisher's failure to buy Browning's book is too attenuated for her to have successfully pleaded causation. We will therefore affirm the dismissal of this claim against *The New Yorker* and Mayer.

The foregoing leaves the tortious interference claim intact against Mr. Clinton only. We will therefore reverse the dismissal of that claim and remand for further proceedings. This requires that we also reverse the dismissal of the common law civil conspiracy claim against Mr. Clinton. In dismissing this claim, the district court relied on its conclusion that Browning failed to plead an underlying tort. *See Halberstam v. Welch*, 705 F.2d 472, 479 (D.C.Cir.1983) (holding that civil conspiracy is not a separate cause of action, but rather a means of establishing liability for underlying torts). We have determined, however, that Browning has stated a tortious interference claim against Mr. Clinton, and he offers no basis for affirmance other than the absence of an underlying tort. As to the other appellees, however, we will affirm the dismissal of the civil conspiracy claim because, as we indicate below, Browning has failed to allege an underlying tort against any of them.

### III.

We agree with the district court that Browning's remaining claims cannot survive Rule 12(b)(6) review. We explain each in turn.

As support for her disparagement of property claim against *The New Yorker* and Mayer, Browning relies on the article reporting Regnery's negative comments. A disparagement of property claim requires that the plaintiff plead "special damages," *Fowler v. Curtis Pub. Co.*, 182 F.2d 377, 378 (D.C.Cir.1950), that is, "pecuniary harm resulting from the defendant's unprivileged publication of false statements, with knowledge or reckless disregard of the falsity, concerning the plaintiff's property or product," *Art Metal–U.S.A., Inc. v. United States*, 753 F.2d 1151, 1155 n. 6 (D.C.Cir.1985). Federal Rule of Civil Procedure 9(g) requires that special damages be "specifically stated," i.e., the plaintiff must allege actual damages with "particularity" and specify " 'facts showing that such special damages were the natural and direct result' " of the defendant's conduct (here, the alleged false and disparaging article). *Fowler*, 182 F.2d at 379 (quoting *Erick Bowman Remedy Co. v. Jensen Salsbery Labs.*, 17 F.2d 255, 261 (8th Cir.1926)). This heightened pleading standard applies because "special damages," unlike general damages, are "not the necessary consequence of [the] defendant's conduct, [but] stem from the particular circumstances of the case." 5 WRIGHT & MILLER, § 1310, at 700. A plaintiff can satisfy this pleading obligation by identifying either particular customers whose business has been lost or facts showing an established business and the amount of sales before and after the disparaging publication, along with evidence of causation. *See Art Metal–U.S.A.*, 753 F.2d at 1155 n. 6 (explaining the type of allegations required to plead special damages); *cf. Fowler*, 182 F.2d at 379 (affirming a dismissal for failure to plead special damages where the plaintiffs alleged only

that "as a result of the malicious publication" they lost a total dollar amount of business).

■ Browning's amended complaint states that "[a]s a proximate result of the publication of [Mayer's article], . . . neither [ ] Browning nor Direct Outstanding Creations Corporation were [sic] able to sell the publishing and other rights in the manuscript," and therefore that they suffered damages "including but not limited to marketing and other business expenses incurred . . ., loss of goodwill, [and] emotional distress and mental anguish." Am. Compl. ¶ ¶ 96, 95. According to Browning, these allegations satisfy Rule 9(g) because they "notify the defendant as to the nature of the claimed damages." Appellant's Br. at 19. Amplifying this point at oral argument, counsel insisted that "the standard of pleading special damages has been relegated to notice pleading." Tr. of Oral Arg. at 10. We find no support for this proposition. Indeed, it runs counter to the very case Browning cites, *Schoen v. Washington Post*, which expressly requires that disparagement of property claims set forth "the precise nature of the losses as well as the way in which the special damages resulted from the allegedly false publication." 246 F.2d 670, 672 (D.C.Cir.1957). The plaintiff in *Schoen* specified his business receipts before and after defendant's disparaging publication, alleged that the publication caused "many customers to withdraw their custom," and identified three such customers. *Id.* Browning's amended complaint contains no allegations remotely like those in *Schoen*. She neither quantifies her loss nor identifies any lost business relationships. She alleges no facts suggesting causation. While it may not be "necessary . . . to provide . . . the *maximum* degree of detail that plaintiff might be capable of providing," Appellant's Br. at 19 (internal quotation marks and

citation omitted) (emphasis added), Browning merely asserts in general terms that *The New Yorker* article cost her financially. We agree with the district court that Rule 9(g) requires more.

Browning alleges three separate defamatory acts by Clinton and one each by Scott and Bennett. For her first claim against Clinton, she asserts that the 1994 memo he and Scott prepared was defamatory and that Clinton "published" it when he showed his notes to Scott. *See Croixland Props.Ltd. v. Corcoran*, 174 F.3d 213, 215–16 (D.C.Cir.1999) (explaining the publication requirement for a defamation claim). The district court found the memorandum protected by both the "common interest" and the "conditional[ ] . . . common law" privileges. *Browning*, No. 98–1991, slip op. at 18. Browning appeals only the latter, so we will affirm based on the former. *See Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n. 4 (D.C.Cir.1990) (holding that an appellant waives an issue not argued in brief). Because her claim against Scott also concerns the 1994 memo, and because Browning also fails to challenge the district court's "common interest" finding with respect to Scott, we will affirm that portion of the district court's order as well.

■ Browning next claims that Clinton defamed her by producing the 1994 memo in the *Jones* litigation and then testifying about it in his deposition. "[S]tatements preliminary to or in the course of a judicial proceeding," however, enjoy an "absolute privilege" "so long as the defamatory matter has some relation— a standard broader than legal relevance— to the proceeding." *Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 338 (D.C.2001) (internal quotation marks and citations omitted). According to Browning, Clinton's production of the memo was "not

incidental to any judicial proceeding," but, rather, Clinton gratuitously "use[d] the judicial system in furtherance of his scheme to defame [ ] Browning." Appellant's Br. at 25, 29. She points to Jones's first set of document requests, the responses to which, Browning contends, did not include her affidavit. Unmentioned by Browning, however, Clinton's response to Jones's second set of document requests indicates that Jones actually sought "all documents created in or relating to the time from May 8, 1986 to the present concerning Dolly Kyle Browning," and that Clinton "produced all documents responsive to this request." Resp. to Pl.'s Second Set of Doc. Reqs. at 19. Because Clinton's production of Browning's affidavit thus "ha[d] some relation" to the *Jones* litigation, *Finkelstein,* 774 A.2d at 338 (internal quotation marks and citation omitted), it is, as the district court found, absolutely privileged.

Browning contends that *Time*'s publication of excerpts from the 1994 memo amounted to another defamatory act by Clinton. The amended complaint, however, nowhere links Clinton to the *Time* publication. Instead, the amended complaint vaguely alleges that "[o]n information and belief, Clinton ... published [the] memorandum to other individuals." Am. Compl. ¶ 75. Browning has thus failed to plead a critical element of defamation, i.e., that Clinton "published" the defamatory statement. *See Croixland,* 174 F.3d at 215.

The defamation claim against Bennett rests on his press statements about Jones's filing. To survive a Rule 12(b)(6) motion, Browning must allege that Bennett's statements "concern[ed]" her—that is, that a "reasonable listener" could think that Bennett was referring to Browning even though he never named her—and that the comments were defamatory. *Id.* When a statement refers to a group, a member of that group may claim defamation if the group's size or other circumstances are such that a reasonable listener could conclude the statement referred to each member or "solely or especially" to the plaintiff. *Serv. Parking Corp. v. Wash. Times Co.,* 92 F.2d 502, 506 (D.C.Cir.1937) (internal quotation marks and citation omitted); *see also* RESTATEMENT (SECOND) OF TORTS § 564A (1977) ("[G]eneral[ly] ... no action lies for ... defamatory words concerning a large group or class of persons," but it may when "the words are ... reasonably understood to have personal application ... [based on the] circumstances[.]"). Insisting that she successfully alleged this element, Browning points out that Bennett's statements refer to Jones's court filings, which included Browning's affidavit, and to Jones's "witnesses," of which Browning was one. "Bennett," Browning asserts, "was plainly accusing [me] of criminal conduct—perjury." Appellant's Br. at 35.

According to Bennett, because he described Jones's filings in their totality, emphasizing their voluminous nature—a "700-page filing"—no reasonable person could think his statement applied to Browning's four-page affidavit. Although that may be true generally, a listener who *knew* Jones's filing contained the Browning affidavit might well believe that Bennett's reference to Jones's "witnesses" pertained to each witness, including Browning. *See* RESTATEMENT (SECOND) OF TORTS § 564 cmt. b (1977) ("If the applicability of the defamatory matter to the plaintiff depends upon extrinsic circumstances, it must appear that some person ... familiar with the circumstances ... [could] reasonably believe[ ] that [the statement] referred to the plaintiff."). We need not resolve this issue, however, for we believe that no reasonable person would be able to infer that Bennett was

accusing Browning of deceitfulness, let alone perjury. Bennett aimed his words of falsehood—"web of deceit and distortions," "vicious and false"—at Jones's entire "700–page" filing. Am. Compl. ¶ 81. By contrast, when Bennett expressly mentioned "witnesses" (again, this included Browning), he spoke merely of their "weaknesses." *Id.* Given the hotly contested and high profile nature of the *Jones* litigation, Bennett's other allegedly defamatory words—"scurrilous," "garbage," "salacious"—amount only to non-actionable "hyperbole." *See Moldea v. New York Times Co.,* 22 F.3d 310, 313 n. 2, 314 (D.C.Cir.1994) (holding that "hyperbole" is protected from defamation claims due to the "constitutional protection afforded to parody, satire, and other imaginative commentary," and explaining the "importance of context" in identifying hyperbole); *see also, e.g., Nat'l Assoc. of Letter Carriers v. Austin,* 418 U.S. 264, 286, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (calling a strikebreaker a "traitor to his country" was "merely rhetorical hyperbole").

Browning's false light invasion of privacy claim rests on the same facts as her defamation claim. We will therefore affirm the dismissal of that claim as well. *See White v. Fraternal Order of Police,* 909 F.2d 512, 518 (D.C.Cir.1990) (holding that the privileges and defenses applicable to a defamation claim apply to a false light claim based on the same facts).

 We turn next to Browning's charge of intentional infliction of emotional distress by Clinton, Bennett, Scott, and Lindsey. This tort requires conduct so "'outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Bernstein v. Fernandez,* 649 A.2d 1064, 1075 (D.C.1991) (quoting RESTATEMENT (SECOND) OF TORTS § 46

cmt. d (1965)). Liability requires more than "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Homan v. Goyal,* 711 A.2d 812, 818 (D.C.1998) (internal quotation marks and citation omitted). As the two cases Browning cites demonstrate, the tort is reserved for truly outrageous behavior. In one case, the defendant gave the plaintiff's home address to a third person who the defendant should have expected would harass and even threaten the plaintiff's life. *See id.* at 818–20. In the other case, a landlord not only tolerated unsafe and unsanitary conditions in his rental properties, but when tenants organized a rent strike, hired workers who harassed and intimidated the tenants, even "brandish[ing]" firearms. *Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 934–35 (D.C. 1995). Browning's allegations are not at all comparable.

In support of her intentional infliction of emotional distress claim against Bennett, Browning again relies on Bennett's statements at the press conference. In our view, however, no reasonable jury could find terms like "scurrilous" and "garbage," uttered during politically charged litigation, to "go beyond all possible bounds of decency." Ordinary Washington press conferences would otherwise routinely invite litigation.

Browning's claim against Clinton relies on the threats she alleges were conveyed through Lindsey and others, the negotiations culminating in the "understanding" that she would "not use 'the A words'" and that Clinton would not "tell lies about her," and Clinton's creation of the 1994 memo and its production in the *Jones* litigation. Yet no reasonable jury could conclude that either the threats or the "A word" "understanding," disturbing as they may have been to Browning, amounted to conduct "utterly intolerable in a civilized

community." *Id.*; *cf. McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 564 (5th Cir.1998) (holding that a plaintiff failed to state an emotional distress claim against her supervisor, who, when the plaintiff sought time off to have surgery, "threatened to fire her," and made comments described by the court as "cruel" and "unfair"). And certainly no reasonable jury could find that Clinton acted "outrageously" by privately meeting with an aide to prepare a memorandum (even an allegedly false one), and then producing it in response to a discovery request. Because the allegations against Clinton encompass Scott's and Lindsey's behavior, Browning's emotional distress claims against them fail as well.

█ Browning's civil RICO claim alleges that Clinton and Lindsey violated the RICO statute by "acquir[ing]," "maintain[ing] control of," and "conduct[ing]" "the affairs" of the Office of the President through a "pattern of racketeering activity," 18 U.S.C. § 1962(b), (c), directed at concealing Clinton's extramarital relationships (including with Browning). She also accuses appellees of "conspir[ing]" to engage in this pattern of racketeering. *Id.* § 1962(d). Browning alleges a series of racketeering activities: threats intended both to deter her from revealing her story and to frighten her into agreeing to the "A word" "understanding" (in violation of the Hobbs Act, *id.* § 1951); interstate telephone calls to negotiate the "understanding," with which she says Clinton had no intention of complying, and to secure the publication of *The New Yorker*'s allegedly disparaging article (in violation of the wire fraud statute, *id.* § 1343); and Clinton's allegedly false *Jones* testimony (in violation of the obstruction of justice statute, *id.* § 1503). Because of these "racketeering activities," Browning claims, she suffered "injury to [her] business and proper-

ty." Am. Compl. ¶ 135; *see* 18 U.S.C. § 1964(c) (authorizing a civil damages suit by "[a]ny person injured in his business or property by reason of a [RICO] violation").

Construing Browning's amended complaint to allege injury by a scheme to intimidate her into keeping her story secret—that is, foregoing her "property right ... to market and sell any description of her long-standing relationship with Clinton"—the district court found this claim barred by the four-year statute of limitations for civil RICO claims because, although Browning alleges receiving threats up to 1992, she did not sue until September 1998. *Browning,* No. 98–1991, slip op. at 20–22. On appeal, Browning claims (as she also did in the district court) that her injury was her "[in]ability to market and publish [her] book," Appellant's Br. at 55, an injury she claims to have discovered no earlier than "the Spring of 1996," when she began "attempting to find a publisher," *id.* at 49. Stated this way, her civil RICO claim still fails. Putting aside whether the alleged conduct violates the cited criminal statutes and therefore constitutes racketeering activity, *see* 18 U.S.C. § 1961 (listing crimes qualifying as acts of racketeering), Browning pleads no facts suggesting "some direct relation between the injury asserted and the injurious conduct alleged"—in other words, proximate causation, *Holmes v. Secs. Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (internal quotation marks and citation omitted). Although the threats and telephone calls leading to the "A word" agreement bear on Browning's charge that Clinton and Lindsey frightened her into not revealing her story, they have nothing to do with the failure of any publisher to buy her novel. Similarly, the relationship between any evaporation of interest in Browning's book and the publication of *The New Yorker* article is "too remote." *Id.* at 269, 112

S.Ct. 1311. Equally unpersuasive is Browning's claim that Clinton's allegedly false and "defamatory" *Jones* testimony "injure[d] [her] ability to market . . . [her] book," Appellant's Br. at 55, for no factual allegations support this utterly conclusory contention. Linking the alleged racketeering activity with her claimed injury requires, as the district court observed, "a huge leap in logic." *Browning,* No. 98–1991, slip. op. at 23.

 Browning's *Bivens* claim, asserted against Clinton and Lindsey, alleges violation of her First Amendment rights because Clinton, acting through Lindsey: (1) "threaten[ed] [her] if she spoke publicly" about her relationship with Clinton; and (2) "forced [her]," by "threatening to defame her," not to use the words "adultery" or "affair" to describe that relationship. Am. Compl. ¶¶ 138, 139 (internal quotation marks omitted). Critical to a successful *Bivens* claim, of course, Clinton and Lindsey must have acted "under color of [federal] authority." *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 389, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Browning theorizes that as "officials at the highest level of the federal government," they "used [their] office[s]" to "threaten and intimidate" her. Appellant's Br. at 57. "All actions of a government official," however, "are not, simply by virtue of the official government's employ, accomplished under the color of . . . law." *Johnson v. Knowles,* 113 F.3d 1114, 1117–18 (9th Cir.1997) (affirming a 12(b)(6) dismissal of a section 1983 suit against a state legislator because the defendant's actions were related to his role as a member of his political party, not to his position as an elected official, and therefore he was not acting under color of state law) (internal quotation marks and citation omitted). To be "under color of authority," the conduct must be "cloaked with official power [and

the official must] purport[ ] to be acting under color of official right." *Lopez v. Vanderwater,* 620 F.2d 1229, 1236 (7th Cir. 1980) (holding that a state court judge's preparation of a criminal complaint against the defendant, and presentation of those charges to himself, were actions taken under color of state law). As the district court found, Browning alleges no facts suggesting that Clinton and Lindsey purported to act under color of official right, or in other words, that their alleged threats (including to defame her) reflected anything more than a private dispute. *See Gritchen v. Collier,* 254 F.3d 807, 812–13 (9th Cir.2001) (holding that a police officer's threat to bring a defamation suit did not constitute action under color of law because "[p]ursuing private litigation [was] not abuse [of the officer's] position or authority as a police officer"). Concluding otherwise would entirely eviscerate the "under color of authority" requirement.

Finally, Browning's counsel asserted at oral argument that the district court erred by dismissing the amended complaint with prejudice. Because that argument appears nowhere in Browning's brief, however, we will not consider it. *See Corson,* 899 F.2d at 50 n. 4.

## IV.

In sum, we: (1) affirm the dismissal of the amended complaint against all appellees except former President Clinton; (2) affirm the dismissal of the defamation, false light invasion of privacy, intentional infliction of emotional distress, civil RICO, and *Bivens* claims against Mr. Clinton; and (3) reverse the dismissal of the intentional interference with business opportunity claim against Mr. Clinton (and the related common law civil conspiracy claim) and remand for further proceedings. With respect to the latter causes of action, we emphasize that given the generous reading

due complaints at this stage, we find only that Browning has stated a claim upon which relief could be granted. Assuming the district court determines that it either has diversity jurisdiction over the remaining common-law claims, *see* 28 U.S.C. § 1332, or that it should retain supplemental jurisdiction, *see id.* § 1367(c)(3), whether Browning can then survive summary judgment or ultimately prevail depends on whether she is able to produce evidence to support her allegation that Mr. Clinton intentionally interfered with her "commercially reasonable expectation" of publishing her book. Proceedings in the district court must concern this narrow issue only. The Federal Rules of Civil Procedure give the district court all the authority it needs to prevent the use of discovery for unrelated purposes.

*So ordered.*