# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 28, 2005　　　Decided December 23, 2005

No. 04-5422

JUDICIAL WATCH, INC.,
APPELLANT

V.

UNITED STATES SENATE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01066)

———

*Paul J. Orfanedes* argued the cause for appellant. With him on the briefs were *James F. Peterson*, *Michael J. Hurley*, and *Meredith L. Cavallo*.

*Thomas E. Caballero*, Assistant Senate Legal Counsel, argued the cause for appellees. With him on the brief were *Patricia Mack Bryan*, Senate Legal Counsel, *Morgan J. Frankel*, Deputy Senate Legal Counsel, and *Grant R. Vinik*, Assistant Senate Legal Counsel.

Before: SENTELLE and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Concurring Opinion filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Senate Rule XXII provides that three fifths of all senators duly chosen and sworn can bring debate on an issue to a close. For amendments of the Senate rules themselves, however, cloture under Rule XXII requires a vote of two thirds of all senators present and voting. Rule V provides that the Senate's rules continue from one Congress to the next unless changed as provided in the Senate rules. The three-fifths rule applies to judicial nominations.

Judicial Watch, Inc., a non-profit organization that advocates "transparency, integrity and accountability in government, politics, and the law," filed suit in district court against the Senate, its Secretary, and its Sergeant at Arms, challenging Rules V and XXII and seeking declaratory and injunctive relief. It claims that the rules in effect require supermajority support for confirmation of judicial nominees, in violation of Article II, Section 2, Clause 2, of the Constitution, which it reads as providing for confirmation by a simple majority.

On a motion under Rule 12(b), the district court dismissed Judicial Watch's suit for want of Article III standing. *Judicial Watch, Inc. v. U.S. Senate*, 340 F. Supp. 2d 26, 38 (D.D.C. 2004). We affirm, though on somewhat different reasoning.

3

* * *

To show constitutional standing, Judicial Watch must meet the familiar requirements of injury-in-fact, causation, and redressability. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Judicial Watch points out that in pursuing its agenda it makes much use of the judicial process, having litigated over one hundred suits in state and federal court since its inception in 1994. It alleges that the challenged Senate rules have slowed the confirmation process and thus the filling of judicial vacancies, thereby injuring it by increasing delay in its lawsuits and adversely affecting its interest in "the efficient and proper function of the federal court system." *Judicial Watch*, 340 F. Supp. 2d at 32. As delay appears to be the only specific impairment of efficient function alleged, we will focus on it.

The district court found that Judicial Watch failed to show any of the three elements of Article III standing. *Id*. at 31-38. In rejecting Judicial Watch's claim of injury-in-fact it relied heavily on language in *Lujan* describing the requisite injury as "invasion of a *legally protected* interest." *Id*. at 31-32 (emphasis added) (quoting *Lujan*, 504 U.S. at 560). The court concluded that Judicial Watch's interest in speed of litigation either was not protected by the provisions that Judicial Watch cited (namely, 28 U.S.C. § 44 (providing for circuit judge appointments), the First Amendment, and the Due Process Clause of the Fifth Amendment), or at any rate was not protected by those provisions in such a way that the delays Judicial Watch claimed amounted to invasion of any "right" that they afforded Judicial Watch. 340 F. Supp. 2d at 35. We, instead, assume arguendo that Judicial Watch has met the injury-in-fact requirement but find that its allegations fail to support an inference that the rules challenged here caused the alleged injury. See *Allen v. Wright*, 468 U.S. 737,

751 (1984); *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41 (1976).

Our review of the grant of the motion to dismiss for want of jurisdiction is de novo. See *Information Handling Services, Inc. v. Defense Automated Printing Services*, 338 F.3d 1024, 1029 (D.C. Cir. 2003). In assessing plaintiff's allegation that Rules XXII and V caused delays in plaintiff's lawsuits, we assume the correctness of all plaintiff's allegations of specific facts, such as the duration of specific appeals filed by plaintiff (which in any event are matters of public record). We do not, however, automatically accept its conclusory allegations that the challenged rules were a material cause for those durations. We assess plaintiff's specific allegations for their "logical adequacy," *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987), and for "quantum of proof," *id*., i.e., whether the specific alleged facts support inferences claimed by plaintiff, including an inference of causation, *United Transp. Union v. ICC*, 891 F.2d 908, 913 n.9 (D.C. Cir. 1989) (analyzing *Simon*).

The first question is what rule would prevail in the absence of Rule XXII. As Senate practice from 1806 until the initiation of formal cloture rules in 1917 was evidently one of unlimited debate, invalidation of Rule XXII might well restore that practice, causing (on Judicial Watch's theory) yet more delay. This of course edges over into problems of redressability. But Judicial Watch's complaint asked for an injunction to stop defendants from "continuing to prevent votes" on the nominations of Miguel Estrada and Priscilla Owen (a request mooted by Miguel Estrada's withdrawal and Judge Owen's confirmation), Complaint at 9, Joint Appendix ("J.A.") 17; given that request, it seems fair to read the next request in the complaint, asking for "any and all other relief the Court deems just and proper," *id*., as encompassing a request for judicial substitution of a simple majority rule for

cloture on judicial nominations. But while Judicial Watch may have *asked* for such a judicial rewrite, our providing one would obviously raise the most acute problems, given the Senate's independence in determining the rules of its proceedings and the novelty of judicial interference with such rules. See *Page v. Shelby*, 995 F. Supp. 23, 29 (D.D.C. 1998), *aff'd*, 172 F.3d 920 (D.C. Cir. 1998) (table). Rather than embark on those issues, we will assume arguendo that a court could somehow overcome them. But even with the heroic assumption that Judicial Watch might secure an order requiring a simple majority for cloture, we find that its causation allegations fail to show two links needed to support an inference that the three-fifths cloture rule caused slower case processing than would have prevailed under a majority cloture rule.

First, we note that Judicial Watch offers no systematic evidence of confirmation delay due to Rule XXII. Granted, it faces considerable difficulty marshalling evidence, as the only changes in rules from 1917 to the present have been first to make non-unanimous cloture possible, then to reduce the requisite cloture majority (from two-thirds to three-fifths) and to change the applicable baseline (from senators present and voting to all senators). In any event, even if recent times have manifested an increase in confirmation times (a proposition that in fact is highly sensitive to the definition of the time period in which nominations may have been susceptible to the filibuster and to the classification of nominees ultimately not confirmed), plaintiff has alleged no facts supporting an inference of a material role for Rules V and XXII. Given the great variation in confirmation times in the nearly 200 years during which at least as a formal matter the Senate might be argued to have applied a supermajority cloture rule, it is not enough, in trying to support an inference that Rule XXII has played a material role, to rely simply on intuition.

Second, even if Rule XXII has materially slowed the confirmation process, plaintiff's allegations do almost nothing to show that such a slowing has materially increased case disposition time. One relevant variable that may be a main driver of disposition times, and relatively unresponsive to small changes in overall judgepower, is pre-argument processing (including procedural and dispositive motions). In fact, in the D.C. Circuit, the venue which Judicial Watch cites for evidence of delay, the median time from filing a notice of appeal to filing the last brief is four months longer than the systemwide median, while the median time from notice of appeal to final disposition is only 0.1 months (merely three days) longer than the median time for all circuits. See Administrative Office of the U.S. Courts, U.S. Courts of Appeals Statistical Tables (Mar. 2003), *available at* http://jnet.ao.dcn/img/assets/4647/appeal303.pdf (Table B4). Moreover, judges may respond to judicial vacancies by working harder.

To show a link between delays in confirmations and in case dispositions, Judicial Watch again offers at best anecdotal data. It points in particular to two of its appeals filed in and decided by this court during the filibuster of Miguel Estrada in 2002, Oral Arg. Tape at 1:58; Complaint at 5, J.A. 13 (citing *Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002); *Meng v. Schwartz*, 48 Fed. Appx. 1 (D.C. Cir. 2002)), which took roughly 16-17 months from filing to disposition,[1] and four cases unresolved when the complaint was filed and lasting roughly 18, 8, 6, and 5 months up to that

---

[1] In the *Meng* case the 16-17 months estimate is a bit of a stretch, as the panel opinion issued about 13 and 1/2 months after filing; final rejection of an en banc petition required 2 and 1/2 additional months.

moment.[2]     By way of supposed contrast, Judicial Watch's complaint asserts that the median filing-to-disposition time for all federal appeals in 2002 was 10.7 months.

The evidence proves little.  First, Judicial Watch never in fact identifies what it regards as the filibuster era.  Our best guess is that it sees that era at least as encompassing 2002—the cases that Judicial Watch cites for evidence of delay were initiated in February and August of 2001, and the filibuster of its prime example, nominee Miguel Estrada, was ongoing in that year.  But with no assertion of a specific time period, Judicial Watch has posed an effectively non-falsifiable claim.  Second, Judicial Watch makes no effort to compare the systemwide case disposition time of 10.7 months in 2002 with disposition times in what it regards as filibuster-free eras.  Third, focusing solely on its own D.C. Circuit cases, Judicial Watch makes no effort to show a pattern over time; and it disregards cases that it filed in the same era that were speedily resolved: *Judicial Watch, Inc. v. Department of Justice*, No. 01-5019, 2001 WL 800022 (D.C. Cir. 2001) (4.5 months), and *Hall v. Larsen*, 46 Fed. Appx. 634 (D.C. Cir. 2002) (8 months).  See J.A. 31-32 (listing law suits filed by Judicial Watch).

---

[2] These in due course concluded, taking roughly 20, 18, 8, and 12 months.  See *Chung v. U.S. Dep't of Justice*, 333 F.3d 273 (D.C. Cir. 2003) (20 months until panel decision and 23.5 months until denial of rehearing and rehearing en banc); *United We Stand America, Inc. v. I.R.S.*, 359 F.3d 595 (D.C. Cir. 2004) (18 months); *In re Cheney*, 334 F.3d 1096 (D.C. Cir. 2003) (8 months), *vacated*, *Cheney v. U.S. Dist. Court*, 542 U.S. 367 (2004) (19.5 months since filing notice of appeal in D.C. Circuit), *mandamus granted en banc*, *In re Cheney*, 406 F.3d 723 (D.C. Cir. 2005) (30 months since filing original notice of appeal in D.C. Circuit); *Stewart v. Evans*, 351 F.3d 1239 (D.C. Cir 2003) (12 months).

Again, serious comparison would pose great difficulties. Judicial Watch and the Senate do not even agree, for example, on the calculation of vacancies. Compare Appellees' Br. at 36-37 n.26, with Appellant's Reply Br. at 7 n.2. Ideally one would consider vacancies and nomination delays by circuits and court terms, and try to ascertain what if any relation may exist between these and case delay, accounting for other relevant differences. Judicial Watch has instead offered only a handful of cases selected to overrepresent case delay; these don't begin to cut it.

In short, Judicial Watch has failed to substantiate either essential link—between Rule XXII and delayed vacancy filling, and between delayed vacancy filling and delayed adjudication. See *Allen*, 468 U.S. at 759.

Because we agree with the district court that Judicial Watch failed to establish the causation element of Article III standing, the judgment of the district court is

*Affirmed.*

WILLIAMS, *Senior Circuit Judge*, concurring: I write separately to express my puzzlement over the meaning of *Lujan v. Defenders of Wildlife*'s requirement that, for "injury in fact," the plaintiff must show "invasion of a *legally protected interest* which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." 504 U.S. 555, 560 (1992) (emphasis added) (citations and quotation marks omitted).

The modifier "legally protected" has appeared episodically in Supreme Court opinions since its introduction in *Lujan*. Some seven cases employ the phrase, but in only two is it applied. See *McConnell v. FEC*, 540 U.S. 93, 227 (2003) (finding a want of standing because the "injury" of not being able to compete in elections with equal resources is not "legally cognizable"); *Vermont Agency of Natural Resources v. United States* ex rel. *Stevens*, 529 U.S. 765, 771-73 (2000) (finding that False Claims Act, by partially assigning government's injury to relator, confers standing for qui tam suit, but that absent the partial assignment the bounty would no more qualify than would a "wager on the outcome"). Five recite the "legally protected" language, but with no substantive discussion. See *Raines v. Byrd*, 521 U.S. 811, 819 (1997); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997); *United States v. Hays*, 515 U.S. 737, 742-43 (1995); *Adarand Constructors v. Pena*, 515 U.S. 200, 211 (1995); *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663 (1993). Two others expressly restate *Lujan*'s injury-in-fact test *without* the words "legally protected." See *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S 167, 180 (2000) ("In *Lujan v. Defenders of Wildlife*, we held that, to satisfy Article III's standing requirements, a plaintiff must show it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical . . . .") (citation omitted); *Steel Co.*

*v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) ("First and foremost, there must be alleged (and ultimately proved) an 'injury in fact'–a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent,' not 'conjectural' or 'hypothetical.'") (citation omitted).

There are at least two obvious candidates for interpretation of the phrase. One would be that it simply reformulates pre-existing requirements, particularly that the interest affected be a *cognizable* one (variants of which are discussed below). Another would be that it imposes a requirement that the interest be one affirmatively protected by some positive law, either common law, statutory or constitutional. Powerful reasons favor the first interpretation.

First, *Lujan* itself did not purport to announce a new rule but rather appeared aimed at restating the Article III standing triad. See 504 U.S. at 560 ("Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements."). In fact, as we noted in *Claybrook v. Slater*, 111 F.3d 904 (D.C. Cir. 1997), the *Lujan* Court itself found an interest "cognizable" for standing purposes (the desire to observe an animal species, even if purely for aesthetic purposes) with no discussion of any support in any positive law. See *id*. at 907 (citing 504 U.S. at 562-63). Indeed, after using "legally protected" in the standing formula, the *Lujan* Court never again referred to it except commingled with "justiciable," namely, in the observation that courts can participate in enforcement "only to the extent necessary to *protect* justiciable individual rights," 504 U.S. at 577 (emphasis added) (citation and internal quotation marks omitted). In *Stevens*, too, the words seemed in the course of the opinion to morph into "legally cognizable."

Second, the use of the phrase "legally protected" to require showing of a substantive right would thwart a major function of standing doctrine—to avoid premature judicial involvement in resolution of issues on the merits. In *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153-54 (1970), the Court rejected the "legal interest" standard, proclaiming the separation of standing from merits issues. Since then it has continually insisted that Article III requires courts to refrain from substantive adjudication in the absence of a "case or controversy." See *Steel Co.*, 523 U.S. at 89-102; *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85 (1999). Given the imperative of standing as a threshold to rights determinations, it would seem strange to bring in through the backdoor what *Data Processing* threw out by the front.

Third, the cases that *Lujan* itself purports to recapitulate, see 504 U.S. at 561, seem to demand only that the injury be "cognizable." See *Allen v. Wright*, 468 U.S. 737, 755-56 (1984) (finding "stigmatic injury" of racial discrimination "not judicially cognizable"); *Warth v. Seldin*, 422 U.S. 490, 514 (1975) (discussing statutory expansion of "judicially cognizable injury"); *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972) (noting that the injury in fact requirement does not "prevent any public interests from being protected through the judicial process").

Fourth, the Court appears to use the "legally protected" and "judicially cognizable" language interchangeably. Thus, in *Bennett v. Spear*, 520 U.S. 154 (1997), a post-*Lujan* case making no mention of "legally protected," the Court substituted "judicially cognizable" in the exact place occupied in *Lujan* by "legally protected," saying that Article III standing required "that the plaintiff have suffered an 'injury in fact'–an invasion of a *judicially cognizable interest* which is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical." *Id*. at 167 (emphasis added). Others lapse into "cognizable" after an initial reference to "legally protected." See *Raines*, 521 U.S. at 820 (the court must inquire whether the injury is "personal, particularized, concrete, and otherwise judicially cognizable"); *United States v. Hays*, 515 U.S. 737, 746 (1995) (finding claim of voters' injury of living in segregated district not cognizable). And, as noted above, *Lujan* itself reverted to "cognizable" after the one reference to "legally protected" in the formula.

Of the two cases actually applying the "legally protected" phrase, *Stevens* fits comfortably within the "judicially cognizable" label, at least if that phrase is understood (1) to encompass the other conventionally stated requirements (that the injury be concrete and particularized, and actual or imminent) and (2) possibly to serve as a screen (perhaps open-ended) against interests that it would make little sense to treat as adequate. In *Stevens* the Court accepted a qui tam relator's bounty as legally protected, but only after making clear that someone who had placed a wager on the outcome of a suit would not have standing, 529 U.S. at 772, and, more generally, that "an interest that is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury," *id*. at 773. This function as an open-ended screen fits Judge Posner's hypothesis that the Court may have meant "just that not any old injury can satisfy Article III." *DePuy, Inc. v. Zimmer Holdings, Inc.*, 384 F. Supp. 2d 1237, 1240 (N.D. Ill. 2005).

*McConnell* is more perplexing. There the Court seemed to mingle the breadth or diffusion of plaintiffs' claims (which seems to involve the concrete/particularized and actual/imminent distinction), with issues of substantive right (whether an interest is protected under positive law). Plaintiffs, candidates and voters (and organizations of voters), attacked a provision of the Bipartisan Campaign Reform Act of 2002 that raised the "hard money" limits of prior

legislation, claiming that it deprived them of "an equal ability to participate in the election process based on their economic status." The Court said that it had "never recognized a legal right comparable to the broad and diffuse injury asserted by the . . . plaintiffs." 540 U.S. at 227. The two adjectives might suggest that the defect of plaintiffs' interest was its breadth or diffusion (though why a competitive interest would be too broad or diffuse is obscure–see, e.g., *National Credit Union Administration v. First National Bank*, 522 U.S. 479 (1998)). But the Court then went on to assert unambiguously merits propositions, quoting *Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. 238, 257 (1986), for the point that the right to political "'free trade' does not necessarily require that all who participate in the political marketplace do so with exactly equal resources," and *Buckley v. Valeo*, 424 U.S. 1, 48 (1976), for its rejection of any government interest in equalizing relative ability to compete as a justification for burdens on speech in the form of expenditure limits. *McConnell*, 540 U.S. at 227. In explaining these merits propositions, neither *Massachusetts Citizens* nor *Buckley* ever hinted that the interests or rights in question failed for excessive breadth or diffusion.

Of course the "zone of interests" requirement of prudential standing poses the question whether the plaintiff's interest is so incongruent with the statutory purposes as to preclude an inference that Congress might have intended such a party as a challenger. See *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 395 n.9 (1987). Some decisions use the "legally protected" language to reject claims on the ground of such incongruity. Thus in *Animal Legal Defense Fund v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998), we said that a hypothetical sadist's interest in seeing animals living under inhumane conditions wouldn't qualify, because the statute in question (the Animal Welfare Act) "recognizes no interest in sadism." *Id*. at 434 n.7. We framed the defect as a lack of

6

*Lujan*-required legal protection. *Id*. But Judge Sentelle's analysis in dissent, saying that the majority had conflated Article III and prudential standing, *id*. at 449, seems correct. (Neither the hypothetical, nor the choice of its correct standing slot, appears to have been determinative of the outcome in *Animal Legal Defense Fund*.)[1] See also *DePuy*, 384 F. Supp. 2d at 1240 (noting that "most cases before and after *Lujan* place the requirement that a plaintiff have a legally protected interest on the 'prudential' side of the standing ledger"); *Grossman v. Dean*, 80 P.3d 952, 958 (Colo. App. Ct. 2003) ("The requirement that the injury be to a legally protected interest is grounded on prudential considerations.") (quotation omitted).

Our decision in *Claybrook v. Slater* is also hard to classify. As already noted, we pointed out that in *Lujan* itself the Court had found an aesthetic interest in observing animals to qualify as cognizable without actually examining statutes or any source of positive law to see if it was "legally protected." 111 F.3d at 907. We proceeded to affirm the district court's dismissal of the suit for want of jurisdiction; but our theory of jurisdictional deficit was that the challenged official decision was one committed to agency discretion by law under 5 U.S.C. § 701(a)(2) and thus exempt from judicial review. *Id*. at 908-09. Although we characterized our decision as one of standing, the classification seems to have had no consequence; it certainly didn't involve resolving substantive legal issues. See *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003)

---

[1] Under the reading of *Stevens* offered above, the *Animal Legal Defense Fund* majority's position might be reframed as an application of the idea that "judicially cognizable" includes an open-ended screening function.

(noting that courts lack jurisdiction to review actions committed to agency discretion).

Pending Supreme Court clarification, users of the "legally protected" tag should proceed with caution.