**4934, INC., d/b/a the Godfather,**

**and**

**Lumbermen's Mutual Casualty Company, Petitioners,**

**v.**

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent,**

**Kenneth W. Skeen, Intervenor.**

**No. 89–602.**

District of Columbia Court of Appeals.

Argued May 16, 1990.

Decided March 24, 1992.

John S. Nevin, with whom Thomas G. Hagerty, Washington, D.C., was on the brief, for petitioners.

Gerald Herz, Washington, D.C., for intervenor.

Herbert O. Reid, Corp. Counsel at the time the memorandum was filed, Charles L. Reischel, Deputy Corp. Counsel, and Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., filed a memorandum in lieu of brief, for respondent.

Before TERRY, SCHWELB and FARRELL, Associate Judges.

1. The address of The Godfather was 4934 Wisconsin Avenue, N.W., which accounts for the corporation's name.

TERRY, Associate Judge:

In this workers' compensation case, petitioners seek review of an order of the Director of the Department of Employment Services (DOES) reversing in part a hearing examiner's compensation order. The examiner had ruled that although the injured employee, Kenneth Skeen, had compromised and settled his claim against a third party without obtaining written approval from petitioners (Skeen's employer and its insurance carrier) as required by D.C.Code § 36–335(g) (1988), his failure to comply with that statute was excusable "because of the unique circumstances under which his injury occurred." However, the examiner awarded to petitioners a credit against future compensation in the amount of $30,000, the sum previously received by Skeen. On appeal, the Director of DOES held that because Skeen had no justiciable claim against the third party (the government of Brazil), written approval of the settlement was not required. The Director also ruled that petitioners were not entitled to the $30,000 credit.

We agree with the Director that Skeen had no colorable claim against the government of Brazil and was therefore not required to obtain his employer's approval of the so-called settlement. We also hold, however, that in order to prevent unjust enrichment, petitioners are entitled to a credit for the $30,000 which Skeen actually received from Brazil. Accordingly, we affirm the Director's decision in part and reverse it in part.

I

The facts of this case are undisputed. Kenneth Skeen was employed as a "floorman" or bouncer at a nightclub known as The Godfather, owned by petitioner 4934, Inc.[1] On November 29, 1982, while on duty at The Godfather, Skeen was shot in the abdomen, left hand, and right leg by the twenty-three-year-old son of the Brazilian ambassador to the United States. Skeen filed a workers' compensation claim and, in

December 1983, was awarded temporary total disability benefits from the date of the shooting through March 2, 1983.

On February 17, 1984, Skeen received a check for $30,000 from the Brazilian government. He had previously filed suit against the government of Brazil, the ambassador, and the ambassador's son in the United States District Court for the District of Columbia. When that court dismissed Skeen's complaint,[2] he noted an appeal, which was pending at the time he received the $30,000. On February 23, six days after this payment was made, Skeen voluntarily dismissed his appeal.

Skeen later filed a second workers' compensation claim seeking additional disability benefits for the period beginning March 21, 1986, and continuing indefinitely. While the earlier claim had been based on Skeen's actual physical injuries, this one asserted that he was suffering from post-traumatic stress syndrome. The employer did not contest the medical aspects of Skeen's claim, which was supported by his own testimony and by the reports of two psychiatrists. However, because Skeen had received the $30,000 payment from Brazil, petitioners maintained that they had no further obligation to pay him workers' compensation benefits. They contended that he had violated D.C.Code § 36–335(g) by failing to obtain their prior written approval of his settlement with the Brazilian government.

After a hearing,[3] a DOES hearing examiner issued an order requiring petitioners to make disability payments to Skeen, retroactive to March 6, 1986. The examiner found as a fact that "on February 17, 1984, [Skeen] accepted monies, in an amount less than the compensation to which he would be entitled, to compromise his claim against third parties responsible for his work injury." She further found that "no written approval of this arrangement was obtained from employer by [Skeen] at the time of, or prior to, acceptance of the monies" and that D.C.Code § 36–335(g) "relieves employer of liability for compensation in excess of the amount so recovered." The examiner went on to hold, however, that Skeen was excepted from the written approval requirement of section 36–335(g) because he "had good cause for his failure to obtain the requisite written approval. [Skeen] was barred from disclosure of the terms under which his claim was partially resolved because of the unique circumstances under which his injury occurred," namely, the fact that "[t]he third party responsible for his injuries and subsequent disability was immune from civil or criminal suit under the laws of the United States." Skeen was therefore awarded disability benefits continuing indefinitely from March 6, 1986, but "with a set-off credit for $30,000.00 received by [Skeen] on February 17, 1984."

On appeal the Director of DOES affirmed the examiner's award of disability benefits, but reversed the grant of a $30,000 credit to petitioners.[4] The Director wrote in her decision:

Article 37 of the Vienna Convention ... provides that the members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving state, enjoy the privileges and immunities specified in Articles 29–36. This includes immunity from civil action for damages. Accordingly, the Director concludes that since [Skeen] had no right, as a matter of law,

2. *Skeen v. Federative Republic of Brazil,* 566 F.Supp. 1414 (D.D.C.1983).

3. At the hearing, petitioners filed a motion to compel production of certain documents relating to the alleged settlement agreement with Brazil. Skeen argued that the agreement was confidential and that the documents could not be produced without the approval of the United States Department of State and the Brazilian government. The examiner granted petitioners' motion, but only as to Skeen, holding that DOES had no jurisdiction to compel discovery

from nonparties. She advised petitioners, however, that their attorney was free to pursue any other remedies available under the Superior Court Rules of Civil Procedure for failure to comply with the agency's subpoena. Neither Skeen nor his attorney ever produced the documents.

4. The $30,000 credit was exhausted by March 15, 1989, at which time petitioners began to make payments to Skeen.

to hold the assailant, the Ambassador, or the Federat[ive] Republic of Brazil liable for damages in this case, there was no third party action to compromise and there was no employer/carrier approval required. [Neither the] filing of an action, the voluntary payment of $30,000.00 by Brazil, nor the dismissal of [Skeen's] appeal creates liability for damages where all parties against whom recovery is sought enjoy immunity from liability due to sovereign or diplomatic immunity. It was, therefore, error as a matter of law, and the Director so concludes, for the Hearing Examiner to find that "[Skeen] compromised his claim against third persons for a sum certain without obtaining prior written approval from employer." Based on this conclusion, the employer is not entitled to a set-off of the sum of monies received by [Skeen] at the U.S. Department of State on February 17, 1984. It is therefore unnecessary to determine employer's contention that the Hearing Examiner abused her discretion by excusing [Skeen] from the mandatory approval requirement of § 36–335(g) of the Act. Since the Director has determined that [Skeen] did not compromise a claim for damages against a third-party tortfeasor, it follows that there was no employer approval required by § 36–335(g) of the Act, and it is not necessary to determine whether [Skeen] was properly excused for his failure to comply with its provisions.

Petitioners now seek reversal of the Director's ruling.

## II

■ Under long-settled principles of appellate review, we must defer to an administrative agency's findings of fact and affirm them if they are supported by substantial evidence in the record as a whole. *See, e.g., Citizens Ass'n of Georgetown v. District of Columbia Zoning Commission,* 402 A.2d 36, 41–42 (D.C.1979); D.C.Code § 1–1510(a)(3)(E) (1987). However, to the extent that an agency's decision involves an issue of law, it is entitled to less deference from a reviewing court because the court "has the greater expertise...." *Saah v. District of Columbia Board of Zoning Adjustment,* 433 A.2d 1114, 1116 (D.C.1981); *see SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("an order may not stand if the agency has misconceived the law"). In this case there are no factual issues, so that our review of the Director's ruling deals only with her legal analysis.

We agree with the Director's understanding of the doctrine of diplomatic immunity and its effect on Skeen's duty under D.C.Code § 36–335(g). Section 36–335 provides in relevant part:

(a) If, on account of a disability or death for which compensation is payable under this chapter, the person entitled to such compensation determines that some person other than those enumerated in § 36–304(b) is liable for damages, he need not elect whether to receive such compensation or to recover damages against such third person.

＊　　＊　　＊　　＊　　＊　　＊

(g) If compromise with such third person is made by the person entitled to compensation or such representative of an amount less than the compensation to which such person or representative would be entitled under this chapter, the employer shall be liable for compensation as determined in subsection (f) of this section, *only if the written approval of such compromise is obtained from the employer and his insurance carrier by the person entitled to compensation* or such representative at the time of or prior to such compromise in a form and manner prescribed by the Mayor. [Emphasis added.]

The Director concluded that the examiner had erred in classifying the funds received by Skeen from the Brazilian government as a settlement or compromise governed by D.C.Code § 36–335(g). She ruled that, as a matter of law, any recovery by Skeen from either his assailant or the government of Brazil was barred by diplomatic immunity. Because Skeen was not entitled to any recompense from a third party, the Director

held, the transfer of $30,000 to him was a "voluntary payment" and therefore outside the purview of section 36–335(g). Consequently, petitioners' prior approval of the payment was not required, and petitioners remained under an obligation to pay disability benefits to Skeen.

 Petitioners contend that the $30,000 payment to Skeen constituted a settlement of his claim against the Brazilian government, and that Skeen's immediate dismissal of his appeal is proof that the claim was settled. Petitioners are correct in asserting that, as a general rule, forbearance from asserting a claim constitutes good consideration for compromise and settlement. *Rommel v. West American Insurance Co.*, 158 A.2d 683, 685 (D.C.1960); *Saunders System Washington Co. v. Kuffner*, 75 A.2d 136, 137 (D.C.1950). There is, however, a limitation on that rule: the claim foregone must be "advanced in good faith and ... not obviously absurd in fact *or plainly unfounded in law....*" *Magruder v. National Metropolitan Bank*, 40 A.2d 828, 830 (D.C.1945) (emphasis added); *accord, Rommel, supra*, 158 A.2d at 685; *Saunders, supra*, 75 A.2d at 137. We hold that Skeen's claim against the government of Brazil, the ambassador, and his son was plainly unfounded in law, so that Skeen's purported "settlement" of that claim was a legal nullity.

D.C.Code § 36–335(g) applies only when a workers' compensation claimant settles a claim against a third party who is "liable for damages," *id.* § 36–335(a), resulting from the same injury for which the claimant is seeking compensation. As a matter of law, neither the Brazilian government nor the actual assailant, the ambassador's son, was ever liable for such damages because diplomatic immunity shielded them absolutely from liability.[5] International law is part of the law of the land, *Fatemi v. United States*, 192 A.2d 525, 527 & n. 3 (D.C.1963), and diplomatic immunity has

long been recognized and honored as a fundamental doctrine in international law. Indeed, the principles of diplomatic immunity are much older than the United States itself. *See Davis v. Packard*, 32 U.S. (7 Pet.) 276, 284, 8 L.Ed. 684 (1833).

But we need not base our holding solely on the sometimes amorphous precepts of unwritten international law, for in this case we have both a statute and a treaty on which to rely. 22 U.S.C. § 254d (1988) provides in part:

> Any action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations ... *shall be dismissed*. [Emphasis added.]

Article 31 of the Vienna Convention on Diplomatic Relations, April 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95, provides in part:

> A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. *He shall also enjoy immunity from its civil and administrative jurisdiction....* [Emphasis added.]

*See Caravel Office Building Co. v. Peruvian Air Attache*, 347 A.2d 280, 282 (D.C. 1975) (diplomat cannot be sued for breach of lease); *Hellenic Lines, Ltd. v. Moore*, 120 U.S.App.D.C. 288, 290–291, 345 F.2d 978, 980–981 (1965) (ambassador is not subject to service of process). Article 37 of the Vienna Convention, moreover, provides that the privileges and immunities specified in Articles 29 through 36 extend to members of the family of a diplomatic agent, provided they are not nationals of the receiving state. *Accord, Carrera v. Carrera*, 84 U.S.App.D.C. 333, 335, 174 F.2d 496, 498 (1949). Thus the Director was correct in ruling that Skeen "had no right, as a matter of law," to hold the ambassador, the ambassador's son, or the government of Brazil liable for damages, and that there was therefore "no third party action

---

**5.** Actually, the Brazilian government itself was shielded by sovereign immunity, rather than diplomatic immunity. Skeen's claim against Brazil was based on a theory of *respondeat superior*. The complaint filed in the United States District Court alleged that the ambassa-

dor's son was an "agent, servant, employee and/or official" of the Republic of Brazil, and that the Brazilian government had sufficient knowledge of certain unspecified "prior conduct" of the ambassador's son to have reasonably foreseen the shooting of Kenneth Skeen.

to compromise and ... no employer/carrier approval required."

Any possible doubt that the claim against Brazil and the ambassador's son had no legal foundation is dispelled by the testimony of the attorney who represented Skeen in the federal court proceedings.[6] In testifying before the hearing examiner in this case, that attorney admitted that he knew *before filing suit* that criminal charges against the ambassador's son "had been dropped because of diplomatic immunity." He said that he filed the suit as part of a "three-prong strategy," which also included "media attention"[7] and "political attention," to put "pressure" on Brazil. Finally, the attorney testified, the Brazilian government "offered a certain sum to end all of this. That is basically what it was." When asked whether he had "a right to pursue a claim against Brazil or the other defendants," the attorney replied that he "considered it as a moral claim," but conceded that it had "no legal basis." Given this and similar testimony,[8] we have no difficulty in concluding not only that Skeen's claim was "plainly unfounded in law," *Magruder, supra,* 40 A.2d at 830, but that Skeen's attorney knew it was plainly unfounded in law before he filed the suit in federal court.

### III

■ We disagree, however, with the Director's decision to reverse the examiner's ruling that petitioners were entitled to a credit for the $30,000 payment. Although the government of Brazil had no legal obligation to pay Skeen anything at all, the facts make clear that the payment, albeit gratuitous, was directly related to the shooting and was undoubtedly intended to compensate Skeen to some extent for his injuries. That being the case, we hold that Skeen would be unjustly enriched by $30,-

000 unless petitioners are given a credit for that amount.

■ The modern law of unjust enrichment and restitution has its roots in the common law concept of quasi-contract. At common law there were cases in which the courts, in the absence of an actual contract, nevertheless imposed "a duty ... under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment." *Bloomgarden v. Coyer,* 156 U.S.App.D.C. 109, 116, 479 F.2d 201, 208 (1973) (footnote omitted). To achieve this result, the courts devised "a legal obligation closely akin to a duty to make restitution," *id.* at 118, 479 F.2d at 210, which they called a quasi-contract. From the beginning a quasi-contract has been openly acknowledged to be a "[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise.... It is ... founded on considerations of justice and equity, and on [the] doctrine of unjust enrichment." BLACK'S LAW DICTIONARY 324 (6th ed. 1990). When the essential facts are not in dispute, as in this case, the question of whether a quasi-contract should be recognized is one of law. *Bloomgarden v. Coyer, supra,* 156 U.S.App.D.C. at 119, 479 F.2d at 211.

■ Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another. *Hillyard v. Smither & Mayton, Inc.,* 76 A.2d 166, 167 (D.C.1950); *Sparks v. Gustafson,* 750 P.2d 338, 342 (Alaska 1988); *Partipilo v. Hallman,* 156 Ill. App.3d 806, 810, 109 Ill.Dec. 387, 390, 510 N.E.2d 8, 11 (1987); *see* RESTATEMENT OF RESTITUTION § 1 comment a (1937). In such a case, the recipient of the benefit has a duty to make restitution to the other per-

---

6. Skeen is represented in this court, as he was before DOES, by a different attorney from a different law firm.

7. The attorney testified that he and Skeen appeared on *Sixty Minutes,* a television news program, "and they did a number on Brazil that showed Kenny in the hospital. They showed

the ambassador's son on the beach in Rio. Back to Kenny and back to Rio. They really fired up public opinion."

8. Pertinent excerpts from the attorney's testimony at the hearing below are reproduced in the appendix to this opinion.

son "if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for [the recipient] to retain it." *Id.* § 1 comment c. Thus the doctrine of unjust enrichment depends on whether it is fair and just for the recipient to retain the benefit, not on whether the person or persons who bestowed the benefit had any duty to do so. Indeed, in many cases no such duty exists, as this case illustrates: the government of Brazil had no duty whatever to pay any money to Kenneth Skeen. A claim of unjust enrichment does not require fault on the part of the recipient of the benefit. "His innocence in receiving the benefit does not mean that his retention of that benefit without payment is just." *Partipilo v. Hallman, supra,* 156 Ill.App.3d at 810, 109 Ill.Dec. at 390, 510 N.E.2d at 11 (citations omitted). Finally, every unjust enrichment case is factually unique, for whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next.

The concept of unjust enrichment is well recognized in workers' compensation cases. Courts are frequently presented with claims by employers and insurers for modification of disability benefits, for reimbursement of sums overpaid or erroneously paid, or even for damages from a third party who actually caused the injury. In many such cases the courts apply unjust enrichment principles to reach what they deem to be the correct result. *See, e.g., Louviere v. Shell Oil Co.,* 509 F.2d 278, 284–285 (5th Cir.1975), *cert. denied,* 423 U.S. 1078, 96 S.Ct. 867, 47 L.Ed.2d 90 (1976) (employer's insurer entitled to indemnity from third-party tortfeasor on ground of unjust enrichment); *Estridge v. Stovall,* 704 S.W.2d 653 (Ky.Ct.App.1986) (disabled worker not entitled to simultaneous recovery under state compensation laws and federal black lung statutes; state may recover excess payments on theory of unjust enrichment); *Campbell v. Blue Diamond Mining, Inc.,* 684 S.W.2d 279 (Ky.Ct. App.1985) (disabled worker barred, by principles of unjust enrichment, from receiving simultaneous benefits under state and federal laws); *Hajnas v. Engelhard Mineral & Chemical Co.,* 231 N.J.Super. 353, 555 A.2d 716 (1989) (overpayment); *Liberty Mutual Insurance Co. v. Industrial Commission,* 40 Ohio St.3d 109, 532 N.E.2d 124 (1988) (payment made to worker who, under applicable law, was not entitled to benefits); *Glen Alden Corp. v. Tomchick,* 183 Pa.Super. 306, 130 A.2d 719 (1957) (overpayment); *Roy v. Providence Metalizing Co.,* 119 R.I. 630, 381 A.2d 1051 (1978) (overpayment); *cf. St. Paul Fire & Marine Insurance Co. v. Treadwell,* 263 Md. 430, 283 A.2d 601 (1971) (unjust enrichment claim, which court found "appealing," rejected as contrary to statute). We follow the same course here.

The connection in this case between Skeen's injury at the hands of the ambassador's son and the money he received from the Brazilian government simply cannot be ignored. Regardless of its actual motivation for making the payment, Brazil chose to redress Skeen's injuries with that money. Petitioners' duty to pay workers' compensation benefits was triggered by the very same injury. Since Brazil had no legal duty to pay Skeen a penny but paid him anyway, we hold that in the circumstances of this case, *see* RESTATEMENT, *supra,* § 1 comment c, Skeen would be unjustly enriched if he were allowed to keep the $30,000 and still collect all the money which petitioners are required by law to pay him. To hold otherwise would permit double recovery by Skeen, contrary to the policy underlying D.C.Code § 36–335, which "is principally concerned with avoiding double payments on workers' compensation awards." *Felch v. Air Florida, Inc.,* 275 U.S.App.D.C. 403, 406, 866 F.2d 1521, 1524 (1989), citing *Meiggs v. Associated Builders, Inc.,* 545 A.2d 631, 637–638 (D.C.1988), *cert. denied,* 490 U.S. 1116, 109 S.Ct. 3178, 104 L.Ed.2d 1040 (1989). We therefore direct DOES to grant a credit of $30,000 against the disability benefits owed by petitioners to Skeen.

IV

Petitioners make two other arguments which may be more briefly discussed, for they are both without merit.

■ *First,* petitioners argue that the examiner erred by invoking the humanitarian purpose of the workers' compensation statute to excuse Skeen's claimed violation of D.C.Code § 36–335(g). The Director, having based her decision on alternate grounds, declined to review this aspect of the hearing examiner's ruling. We find no error.

When our cases speak of the "humanitarian purpose" of the statute, they refer specifically to the presumption of compensability, D.C.Code § 36–321(1) (1988), which enables a claimant more easily to establish his or her entitlement to benefits and is intended to favor awards in arguable cases. *See Ferreira v. District of Columbia Department of Employment Services,* 531 A.2d 651, 655 (D.C.1987). The reason for this presumption is simply that a worker's sole remedy for a work-related injury is the remedy provided by the statute; consequently, if the statutory benefits are unavailable for any reason, the worker will not be compensated at all for the injury. However, when it is undisputed that a claimant's injury arose out of his or her employment and is therefore compensable, "the presumption is no longer part of the case" because it is no longer necessary to effectuate the humanitarian purpose of the law. *Dunston v. District of Columbia Department of Employment Services,* 509 A.2d 109, 111 (D.C.1986).

There is no dispute in this case that Skeen's injuries arose from his employment. While the examiner undoubtedly erred in basing her decision to exempt Skeen from D.C.Code § 36–335(g) on the "humanitarian purpose" of the statute,[9] the Director did not err by refusing to acknowledge the examiner's reasoning. The humanitarian aspect of the statute—specifically, the presumption found in section 36–321(1)—relates to claims by an employee for benefits to be paid by his or her employer. Nothing in the statute suggests that this presumption is intended to facilitate recovery against third parties by ei-

ther the employer or the employee. In a case such as this, the humanitarian purpose of the statute is essentially irrelevant.

■ *Second,* petitioners contend that the examiner's failure to compel production of the agreement between Skeen and the government of Brazil deprived them of their due process right to a full and fair adjudication of this case. The Director concluded that the examiner's refusal to subpoena Skeen's attorney and force disclosure of the document was error, but that the error was harmless because Skeen had no litigable claim against Brazil. We need not even go that far. We hold that if the examiner's failure to issue a subpoena was error—which we do not decide—it was necessarily harmless. Disclosure of the document could have had no possible effect on the outcome of this case because the details of the agreement had no bearing on the dispositive legal issue, namely, whether Skeen had a valid claim against Brazil in the first place.

### V

We reverse in part the decision of the Director and remand this case to DOES with directions to grant a credit to petitioners in the amount of $30,000, the sum previously received by Skeen from the government of Brazil. In all other respects the Director's decision is affirmed.

*Affirmed in part, reversed and remanded in part.*

### APPENDIX

The following is an excerpt from the transcript of the hearing in this case on Kenneth Skeen's second workers' compensation claim, held on January 28, 1988. The witness is the attorney who represented Mr. Skeen in the suit filed in the United States District Court against the Republic of Brazil, the Brazilian ambassador, and the ambassador's son. The cross-examiner is Mr. Skeen's present attorney.

---

9. The examiner wrote in her order, "[I]n light of the humanitarian purpose of the Act, which is to compensate injured employees for work-related disabilities, I find that invoking the written ap- proval requirement of [section] 36–335 is not appropriate in this case." Why it was "not appropriate" was not explained.

**58** ■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■

Q. Did you determine prior to the filing of the lawsuit in the United States District Court for the District of Columbia whether or not the party who shot Mr. Skeen enjoyed diplomatic immunity?

A. Yes, he did. As a matter of fact, it had already been ruled on, and the criminal charges had been dropped because of diplomatic immunity.

\* \* \* \* \* \*

Q. Did the ambassador enjoy diplomatic immunity, Mr. Coale?

A. Yes.

Q. And did the party who shot Mr. Skeen enjoy diplomatic immunity?

A. Correct.

Q. There was a prior criminal hearing on the shooting that occurred on November 29, 1982?

A. I believe that it was a hearing or that the State Department instructed through Justice that they had diplomatic immunity.

Q. So no criminal actions were taken against the man who shot Mr. Skeen?

A. True.

Q. And he was never incarcerated or charged by the District of Columbia or by the federal government for that criminal act?

A. True.

Q. When you filed the lawsuit in the United States District Court for the District of Columbia, were you aware or did you know whether or not in fact you had a valid or invalid lawsuit against the Federat[ive] Republic of Brazil and the two other defendants?

[Objection overruled]

A. I had a real good idea.

Q. What was that? What was your idea?

A. Can I explain this in the context?

Q. Yes.

A. On cases like Kenny's and some other, for lack of a better word, high profile cases, that you know are going to have a lot of media attention and political attention, at the time diplomatic immunity was a pretty hot issue.

I felt that my job was to do everything that I could to help Kenny out and get him something. A successful action that I'd taken in other cases which I would point out that you can't any more, but in this day Rule 11 was not enforced very much at all.

Q. Tell us about Rule 11.

A. Rule 11, yes. If one files a claim or if one filed a motion or something in federal court, under Rule 11 if the motion or if the suit really doesn't have any chance of then winning or it is frivolous, you get hit hard. You get the attorney fees for the other side. You get sanctions.

The rule was on the books then, but it really wasn't enforced very much. Now it is. It is very strict. The judges are doing a lot.

I wouldn't have filed the case now.[*] But then I filed the case as part of an overall strategy with three prongs. There was to get the media attention and to get the political attention. That's exactly what happened. I followed the lawsuit with a lot of hoopla, with a lot of P.R. Because of that both Kenny and I appeared on *Sixty Minutes,* and they did a number on Brazil that showed Kenny in the hospital. They showed the ambassador's son on the beach in Rio. Back to Kenny and back to Rio. They really fired up public opinion.

At the same time I was in touch with Senator Laxalt, Paul Laxalt, who was pressuring Brazil and the State Department to do something. The same thing was done in People magazine, the Washington Post Sunday magazine, and in lots of other media.

My argument to the media was this was the time that there was a ten billion dollar debt from Brazil that they were not paying back. My basic message that got across to the media, which was through me and Ken-

* Fed.R.Civ.P. 11 was extensively amended in August 1983 to read substantially as it does today.

Skeen's suit in federal court was filed on December 9, 1982.

ny to the reporters, was that they were taking ten billion dollars from us in debt, but they can't even pay this poor guy's hospital bills even if they are diplomatically immune. Paul Laxalt was apparently doing the same thing politically.

Now this three-prong approach worked. When the case was dismissed at the trial level, I couldn't do anything but appeal to keep the pressure on. I received a call from the State Department that enough was enough.

Q. You say the case was dismissed?

A. The case was dismissed at the trial level. The first motion to dismiss was granted. It was thrown out.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. What was the basis of the motion that was filed to dismiss?

A. The diplomatic immunity. That was basically it, then.

Q. Was that motion granted?

A. Yes.

Q. So at the point of time that you made any type of agreement for payment with the Brazilian government, you did not have a pending action in the United States District Court for the District of Columbia?

A. Correct.

Q. Go ahead.

A. Now I had to keep the pressure on. I got a call from the State Department that [said] basically let's end this, that enough is enough. There was a new ambassador that was coming in from Brazil. The old one was gone. The Brazilian government wanted this to stop. There were periodic updates in the media, I believe. They wanted to know how Kenny was doing. They offered a certain sum as a gift to end all of this. That is basically what it was.

My three-prong strategy I don't think that you could use today. I have used it in the past in other high profile cases. It worked. But it is Rule 11 today. It would be a very expensive action.

Q. So the agreement that you entered into with the Brazilian government was entered into after the motion to dismiss your lawsuit had already been granted?

A. True.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Had you taken an appeal from the motion?

A. Yes.

Q. And that was pending in the United States ... Court of Appeals for the District of Columbia [Circuit]?

A. Correct.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Did you in fact, under any law or treaty of the United States, never mind the lawsuit, have a right to pursue a claim against Brazil or the other defendants, Mr. Coale?

A. I considered it as a moral claim. If the—

Q. So you had no legal basis?

A. No.

Q. The monies that were paid, were they paid to you based upon any legal theory or right or cause that Mr. Skeen had against the Brazilian government?

A. No. That was never discussed.

Q. Or that you were aware of?

A. Or that I was aware of.