Opinion for the court by Circuit Judge ROGERS.
Dissenting opinion by Senior Circuit Judge WILLIAMS.
ROGERS, Circuit Judge:
The Inter-American Investment Corporation (“IIC”) appeals the denial of its motion to dismiss an independent consultant’s unjust enrichment claim on grounds of immunity and untimeliness. Applying the well-settled test in this circuit, we affirm the denial of immunity. By waiving immunity from unjust enrichment claims of independent consultants whom the IIC solicits to help negotiate the commercial lending agreements that are central to its function, the IIC gains a corresponding benefit that furthers its objectives. Consultants would be more willing to negotiate with the IIC and to enter into contracts with it if they had the reassurance that should their agreement or formal contract fail for whatever reason, they would be fairly compensated for any benefit they have provided that the IIC has unjustly retained. Such a benefit affords the IIC flexibility in using independent consultants, allowing it, for instance, to establish and maintain relationships with consultants whom it may want to engage without a formal written agreement. Furthermore, underlying an unjust enrichment claim are the same contract principles as the promissory estoppel claim held not to be barred by immunity in Osseiran v. Int’l Fin. Corp., 552 F.3d 836 (D.C.Cir.2009). As the IIC has not posited litigation costs that are distinguishable from those involved in a claim for promissory estoppel, the IIC suggests no principled basis on which to distinguish our precedent involving international organizations with near-identical waiver provisions. Accordingly, taking the allegations of the complaint as true for purposes of the motion to dismiss, because the unjust enrichment claim was timely filed we remand the case to the district court.
I.
The IIC is an international organization formed by its member nations under the Agreement Establishing the Inter-American Investment Corporation, Nov. 19, 1984, T.I.A. S. No. 12087 (entered into force, March 23, 1986) (“IIC Charter”). Currently, forty-three countries, including *367 the United States, are members of the IIC. See IIC Inter-American Investment Corporation: Member Countries, http:// www.iic.int/membereountries. As stated in its Charter, the purpose of the IIC is “to promote the economic development of its regional member countries by encouraging the establishment, expansion, and modernization of private enterprises.” IIC Charter art. I, § 1. Together with other international organizations, the IIC fulfills this objective through commercial lending that is directed to private enterprises in the member countries. IIC Charter art. I, § 2. One way the IIC accomplishes this task is by structuring and arranging loans jointly with other lenders to finance projects in member countries.
Jorge Vila is an independent banking consultant in emerging markets. On several occasions from early 2001 to December 2002, the IIC engaged Vila’s services through formal written contracts in connection with projects in Latin America and the Caribbean. According to the complaint, from January to August 2003, after Vila’s previous contracts had expired, several of the IIC’s senior officers requested Vila’s consulting services with regard to four new projects, verbally agreeing to complete contractual documentation, including compensation, “later.” Compl. ¶ 7. These projects related to the IIC’s loan program and ranged from preparation of a marketing description of the organization’s inter-bank loan program to assistance in loan syndication for specific projects. For example, Vila assisted IIC senior officers in obtaining a mandate from a Brazilian bank, Banco Safra, to arrange a syndicated credit facility for the bank. Vila identified potential participant banks, negotiated terms and conditions of the agreement with them and Banco Safra, and contributed to the draft, review, and distribution of the relevant confidential documents. See Compl. ¶ 8. Attached to the complaint are approximately 270 emails documenting Vila’s correspondence with the IIC’s officers and clients and his services. These emails indicate that in addition to having Vila gather “intelligence” on prevailing interest rates, market conditions, and competitors, the IIC authorized Vila to negotiate terms and conditions of the projects with the IIC’s clients, requested his participation in internal discussions of confidential financial information, and invited him to participate on conference calls with IIC clients regarding the projects.
Vila discussed his expectation of compensation with the IIC Regional Head Victor Moscoso between January and May 2003. According to the complaint, Moscoso acknowledged this expectation by email of June 2, 2003. Further, the IIC continued to solicit and accept Vila’s services afterwards. Yet on August 4, 2003, while acknowledging Vila’s work, Moscoso refused to compensate him and suggested new terms for his work in the future. When Vila appealed to Stephen Reed, the IIC’s Deputy General Manager, he too acknowledged Vila’s work but expressed a different understanding of the agreement between Vila and the IIC, noting the absence of a written contract while stating he would ensure Vila’s work was “clarified and documented” by the IIC and Vila would be compensated “based on a success fee.” Compl. ¶ 15. Vila rejected the notion of a success fee by email of September 10, 2003 to Reed, and on October 9, 2003, he emailed Jacques Rogozinski, General Manager of the IIC, an invoice in the amount of $89,909.00 for his services. On November 4, 2003, Alejandra Vallejo, IIC Coordinator of Institutional Affairs, advised Vila that the IIC could not process any payments for consulting services unsupported by a formal agreement with defined terms and conditions. Vila’s appeals, beginning December 23, 2003 to Enrique *368 Iglesias, then-President of the IIC, were to no avail, as were his further entreaties to two entities with oversight responsibilities over the IIC.
On October 26, 2006, Vila sued the IIC for breach of implied contract, unjust enrichment, defamation, and tortious interference with a prospective business advantage. Upon removal to federal court, see 22 U.S.C. § 283gg (2000), the IIC moved to dismiss the complaint on the grounds of immunity, pursuant to Federal Rule of Civil Procedure 12(b)(1), and because the statute of limitations had run, pursuant to Rule 12(b)(6). The district court dismissed all except the unjust enrichment claim and ruled that the complaint was timely filed. The IIC appeals, and the court has jurisdiction over this interlocutory appeal. See Kirkham v. Societe Air Fr., 429 F.3d 288, 291 (D.C.Cir.2005); Rendall-Speranza v. Nassim, 107 F.3d 913, 916 (D.C.Cir.1997).[1] Our review is de novo, see Vann v. Kempthorne, 534 F.3d 741, 745-46 (D.C.Cir.2008); Kirkham, 429 F.3d at 291, and in reviewing the denial of the motion to dismiss, we take the allegations of the complaint as true, see Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253-54 (D.C.Cir.2005); Browning v. Clinton, 292 F.3d 235, 242 (D.C.Cir.2002).
II.
The International Organizations Immunities Act applies to those organizations which the President designates as entitled to the benefits of the Act. Section 2(b) of the Act provides that such organizations “shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.” 22 U.S.C. 288a(b) (2008). By executive order, President Reagan so designated the IIC. Exec. Order No. 12,567, 51 Fed.Reg. 35,495 (Oct. 2, 1986). Article VII of the IIC’s charter provides:
Actions may be brought against the Corporation only in a court of competent jurisdiction in the territories of a member country in which the Corporation has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities.
IIC Charter art. VII, § 3(a). This waiver provision is nearly identical to that in the charter of the World Bank and is common to the charters of other international financial institutions, such as the Inter-American Development Bank and the International Finance Corporation.[2]
In Mendaro v. World Bank, 717 F.2d 610, 617 (D.C.Cir.1983), the court formulated a test to determine whether such charter terms waive a specific type of lawsuit: “A nonspecific waiver such as that [at issue here] should be more broadly construed when the waiver would arguably enable the organization to pursue more *369 effectively its institutional goals.” Put another way, the “[organization]^ immunity should be construed as not waived unless the particular type of suit would further the [organization]^ objectives.” Atkinson v. Inter-Am. Dev. Bank, 156 F.3d 1335 (D.C.Cir.1998). Rejecting in Mendaro the view that the type of waiver in the IIC’s Charter provides a “blanket waiver of immunity from every type of suit not expressly prohibited by reservations,” 717 F.2d at 615, the court observed that if a lawsuit could “significantly hamper the organization’s functions,” id. at 617, then it is “inherently less likely to have been intended,” id. So too “when the benefits accruing to the organization as a result of the waiver would be substantially outweighed by the burdens caused by judicial scrutiny of the organization’s discretion to select and administer its programs, it is logically less probable that the organization actually intended to waive its immunity.” Id. Contrasting the employee lawsuits at issue, which could “significantly hamper” the organization’s functions given its multiple member countries, with claims related to “enhancing] the marketability of its securities and the credibility of its activities in the lending markets,” id. at 618, the court concluded “[potential investors would be much less likely to acquire the Bank’s own securities if they could not sue the Bank to enforce its liabilities. Similarly, the commercial reliability of the Bank’s direct loans and private loan guarantees would be significantly vitiated if its debtors and beneficiaries were required to accept the Bank’s obligations without recourse to judicial process.” Id. The court further concluded “[a] waiver of immunity with respect to the World Bank’s commercial transactions with the outside world is ... evident under Article VII section 3 [of its Charter]. If this immunity were not waived the Bank would be unable to purchase office equipment or supplies on anything other than a cash basis.... Such a restriction would unreasonably hobble its ability to perform the ordinary activities of a financial institution operating in the commercial marketplace.” Id.
Following the analysis in Mendaro, the court recently held in Osseiran, 552 F.3d at 840, that the International Finance Corporation (“IFC”) had waived its immunity from a promissory estoppel claim concerning the IFC’s alleged representations during negotiations for a sale of its investments to private parties. The court again reasoned that “parties may hesitate to do business with an entity insulated from judicial process; promises founded on good faith alone are worth less than obligations enforceable in court.” Id. (citing Atkinson, 156 F.3d at 1338; Lutcher S.A. Celulose e Papel v. Inter-Am. Dev. Bank, 382 F.2d 454, 460 (D.C.Cir.1967)). Observing that the IFC had identified “no unique countervailing costs,” id., the court concluded the broad terms of the waiver provision in the IFC’s Charter were controlling and held the IFC was not immune from a lawsuit for promissory estoppel and breach of confidentiality, id. at 840-41.
It is a short step from this precedent to conclude that Vila’s unjust enrichment claim, like Osseiran’s promissory estoppel claim, is not barred by the IIC’s immunity. Promissory estoppel provides a party with a remedy to enforce a promise where the formal requirements of a contract have not been satisfied, often serving as a substitute for one of these formal requirements, usually consideration. Bender v. Design Store Corp., 404 A.2d 194, 196 (D.C.1979). Therefore, when a contract fails for lack of consideration, courts will, in some circumstances, enforce the promise where the promisee has detrimentally relied. Id. The District of Columbia recognizes unjust enrichment as a species of quasi contract that imposes, “in *370 the absence of an actual contract,” “a duty ... upon one party to requite another in order to avoid the former’s unjust enrichment[,] ... to permit recovery by contractual remedy in cases where, in fact, there is no contract.” 4934 Inc. v. D.C. Dep’t of Employment Servs., 605 A.2d 50, 55 (D.C.1992). Like promissory estoppel, unjust enrichment provides a party with a remedy “to unwind entanglements” that may have arisen from a failed agreement, for instance, “where [the agreement] does not comply with the writing requirement, where one of the parties is represented by an unauthorized agent,” 1-1 Corbin, Contracts, § 1.20, or “where the agreement is too indefinite to be enforced,” id. Underscoring the nature of promissory estoppel and unjust enrichment as remedies for failed agreements, courts tend not to allow either action to proceed in the presence of an actual contract between the parties. See, e.g., Bloomgarden v. Coyer, 479 F.2d 201, 210 (D.C.Cir.1973); Walker v. RFC Corp., 728 F.2d 1215, 1220 (9th Cir.1984); Bldg. Servs. Co. v. Nat’l R.R. Passenger Corp., 305 F.Supp.2d 85, 95-96 (D.D.C.2004) (citing KFC Corp. and collecting cases). And although unjust enrichment— like promissory estoppel — is not a contract remedy, in quasi contract it “give[s] rise to obligations more akin to those stemming from contract than from tort.” Jordan Reys & Jessamy, LLP v. St. Paul Fire, 870 A.2d 58, 63 (D.C.2005) (quoting Bradkin v. Leverton, 26 N.Y.2d 192, 309 N.Y.S.2d 192, 257 N.E.2d 643, 645 (N.Y.1970)); see also Corbin, supra, at § 1.20.
Like Osseiran, Vila seeks a remedy based on the failure of his alleged agreement with the IIC to meet the requirements of a formal contract. His claim, no less than Osseiran’s, exists to prevent the injustice that would result if courts could not enforce such obligations. And, much as Osseiran’s, Vila’s claim arises out of commercial activity with the outside world that is directly related to the IIC’s fulfillment of its chartered objectives. By assisting IIC officers, at their request, in identifying participant banks and negotiating with these banks to provide an interbank loan from the IIC to a private enterprise in a member country, Vila’s services were targeted at the type of commercial lending that the IIC Charter describes as part of the functions that “the Corporation shall undertake” “[i]n order to accomplish its purpose.” IIC Charter art. I, § 2. The IIC reaffirms on appeal that independent consultant services provide important assistance in carrying out its functions. Reply Br. at 6-7, 11. Vila was thus neither volunteering his services nor providing sendees unrelated to the IIC’s purpose. As Vila’s services were related to the furtherance of the IIC’s stated objectives in the commercial marketplace, Mendaro, 717 F.2d at 618, the fact that his claim arises from an independent contractor’s view of the credibility of the IIC’s promises, and not a third party investor’s view of the credibility of the IIC’s financial dealings, is a distinction of no significance. The court’s reasoning in Osseiran about the hesitancy of parties to do business with an organization insulated from judicial process, 552 F.3d at 840, is no less applicable here.[3] The IIC’s attempts to show to the contrary are unpersuasive.
First, the IIC maintains that allowing Vila’s unjust enrichment claim to proceed is of no benefit to it because he was a *371 volunteer seeking compensation for unauthorized services. To the extent this reaches the merits of Vila’s claim, it is irrelevant. At this stage of the proceedings. the court takes the allegations of the complaint as true, Jerome Stevens Pharmaceuticals, 402 F.3d at 1253-54, and so views Vila as seeking recovery for authorized services. Further, the IIC’s position offers no response to Osseiran’s observation that expectations of fair play are relevant to whether parties would hesitate to do business with an international organization. 552 F.3d at 840. An independent consultant with or without a formal contract would be similarly hesitant to do business with the IIC if there would be no reassurance of fair compensation for requested and received services unjustly retained by the IIC if their agreement or formal contract failed. The reasonableness of Vila’s reliance on alleged promises of compensation does not militate against finding waiver. See Osseiran, 552 F.3d at 840 n.3. To the extent the IIC maintains it would receive no benefit from engaging an independent contractor outside of a formal written contractual agreement, the complaint alleges the services at issue were viewed as being of benefit by IIC officials. While the IIC offers that it has no need to waive its immunity to suit for unjust enrichment claims in order to recruit independent consultants, because it provides them with recourse for possible grievances by including an arbitration clause in them contracts, the merits of the IIC’s approach for contracted consultants is beside the point at this stage of the proceedings.
Second, the IIC maintains that allowing Vila’s unjust enrichment claim to proceed would deter the IIC from using independent contractors as consultants because it would no longer have assurance that the settlement of any disputes would be handled through arbitration and be limited to the scope of the contractual arrangement. If the IIC wants assurance that consultant disputes will be bound by arbitration, however, it can bar use of independent consultants who have not been engaged through a formal agreement.
Finally, the IIC maintains that allowing Vila’s unjust enrichment claim to proceed is tantamount to waiving immunity for commercial activity claims generally and would be contrary to Inversora Murten, S.A. v. Energoprojekt-Niskogradnja Co., 264 Fed.Appx. 13 (D.C.Cir.2008), where the court held that the International Organizations Immunities Act, despite later amendments to the Foreign Sovereign Immunities Act, preserves the immunity of international organizations for “commercial activity.” However, drawing a distinction between external activities and the internal management of international organizations reflects well-established precedent, Mendaro, 717 F.2d at 618, without creating an artificial category of waived claims. The court still is required to engage in a weighing of the benefits and costs that a waiver may entail, id. at 617; see Osseiran, 552 F.3d at 840-41, by focusing on the nature of the parties’ relationship rather than the nature of the contested transaction and inquiring as to the reasons why the IIC would waive immunity for this type of suit.
Notably, the IIC has not identified countervailing costs that are distinguishable from the costs associated with a claim for promissory estoppel, see Osseiran, 552 F.3d at 840. Neither has it identified countervailing costs of the nature discussed in Mendaro, 717 F.2d at 618, whereby allowing unjust enrichment claims by independent consultants whose services the IIC requested and received in connection with its core functions would open it to “disruptive interference with its [lending] policies.” Quite the contrary. *372 Allowing such claims would mitigate possible hesitancies by independent consultants to negotiating and entering into formal contracts with the IIC by providing reassurance that if their agreement or formal contract failed, for whatever reason, they would be fairly compensated for any benefit they have provided that the IIC has unjustly retained. The IIC, in turn, also would be afforded flexibility in using independent consultants, including when time-sensitive matters require such services before a formal contract can be executed. These circumstances contrast sharply with the harassing interference noted in Mendaro of allowing a type of employee suit where an organization operates in many different countries. Whether the costs of litigating this type of dispute would make the IIC hesitant to use independent consultants is less clear, but the IIC did not posit any such costs. The most it stated was that “[cjonstruing the Charter provision as a waiver of immunity would open the door to potentially protracted litigation,” Appellant’s Br. at 37. This general statement could be true of any lawsuit and offers no reason why these costs are not indistinguishable from the costs that would arise in promissory estoppel litigation, for which the court has found a waiver of immunity. Nor is it apparent that allowing suits for unjust enrichment that will enable the IIC to use consultants for the types of high level banking transactions at issue — syndicating loans for banks — could be characterized as imposing the type of disruptive harassment of concern in Mendaro.
Contrary to our dissenting colleague’s suggestion, the posited “vagueness” of an unjust enrichment claim does not tilt the balance against waiver. The premise that unjust enrichment is “a cause of action so much vaguer and broader than promissory estoppel,” Dis. Op. at 286, because a plaintiff in an unjust enrichment action is required to demonstrate that the recipient’s retention of the benefit would be “unjust,” is flawed. Both doctrines potentially deal with the vagaries that may exist in order to remedy the injustice that would result if courts failed to enforce quasi-contractual obligations. The doctrine of promissory estoppel specifically requires that courts not give effect to reliance on a promise “unless necessary to avoid injustice,” Granfield, v. Catholic Univ. of America, 530 F.2d 1035, 1041 (D.C.Cir.1976), and when evaluating this “injustice” prong, courts properly consider, among other factors, “the formality of the promise, whether there is a commercial setting and its nature, and whether there is unjust enrichment.” Id. (citing Restatement (Second) Of Contracts § 90, Cmt. (b)); see, e.g., Oates v. Teamster Affiliates Pension Plan, 482 F.Supp. 481, 489 (D.D.C.1979). That courts consider unjust enrichment when evaluating claims for promissory estoppel undermines any suggestion that unjust enrichment is, in general, a vaguer cause of action than promissory estoppel.
Furthermore, the “vagueness” of a cause of action is an unhelpful paradigm in which to balance costs and benefits. The crux of the dissent is its assertion that the vaguer a cause of action, the more expensive it will be to litigate. The dissent cites no authority for this proposition and it is not “obvious[ ],” Dis. Op. at 287, why this proposition would be true. To illustrate, the dissent emphasizes in discussing why promissory estoppel is less vague than unjust enrichment that promissory estoppel’s requisite promise must be a “a promise with definite terms.” Dis. Op. at 287 (emphases omitted) (quoting In re U.S. Office Prods. Co. Secs. Lit., 251 F.Supp.2d 77, 97 (D.D.C.2003)). Yet parties will often disagree over what constitutes a “definite term,” see, e.g., Granfield, 530 F.2d at *373 1040, just as they can disagree over any subjective element of a cause of action. In a given case, such a disagreement may result in more protracted litigation than a disagreement over whether retention of a benefit is “unjust”; in another case, it may not. Either way, the “vagueness” of the cause of action provides little assistance in assessing beforehand whether litigation for this type of suit would be protracted, especially given that the cost of litigation is more directly affected by such factors as the number of relevant documents that the case is likely to produce, the contentiousness of the parties, and the complexity of particular facts, all of which will vary from case to case and none of which turns on the vagueness of the cause of action.[4]
III.
The IIC’s defense that Vila’s unjust enrichment suit fails because it was untimely filed and therefore must be dismissed for failure to state a claim pursuant to Rule 12(b)(6) is logically antecedent to the merits of Vila’s claim. Kilburn v. Socialist People’s Libyan Arab Jamahiriya, 376 F.3d 1123, 1134 (D.C.Cir.2004); see also Rendall-Speranza v. Nassim, 107 F.3d 913, 917 (D.C.Cir.1997). As a matter of judicial efficiency, we exercise pendant jurisdiction over this threshold issue, see Griggs v. WMATA, 232 F.3d 917, 919 n. 2 (D.C.Cir.2000); Gilda Marx, Inc. v. Wildwood Exercise, Inc., 85 F.3d 675, 678, 679 (D.C.Cir.1996) (per curiam), and affirm the denial of the motion to dismiss.
Under District of Columbia law, which applies here, unjust enrichment claims are subject to a three year statute of limitations. See News World Commc’ns, Inc. v. Thompsen, 878 A.2d 1218, 1221 (D.C.2005). Thus, if Vila’s claim accrued prior to October 26, 2003, it would be time barred. Vila alleges that his last service was performed, his request for compensation was refused, and the benefit of his service had been conferred at some date later than this date.
The D.C. Court of Appeals held in Thompsen that the statute of limitations begins to run “when the plaintiffs last service has been rendered and compensation has been wrongfully withheld.” Id. at 1219. The court relied on Zic v. Italian *374 Gov’t Travel Office, 149 F.Supp.2d 473 (N.D.Ill.2001), noting that Zic emphasized that “ ‘the essence of a quantum meruit claim ... is not the plaintiff’s expectancy of payment, but the unjust enrichment of the defendant,’ and held that the defendant was unjustly enriched when the services were rendered and when payment was refused.” Thompsen, 878 A.2d at 1223 (quoting Zic, 149 F.Supp.2d at 476). In Thompsen the court emphasized that “[a] claim for unjust enrichment only accrues ... when the enrichment becomes unjust; the statute of limitations starts to run upon the occurrence of the wrongful act giving rise to a duty of restitution.” Id. (quotations omitted). Applying this test to the plaintiff, the court focused on the date when her last service had been performed, compensation had been refused, and the benefit of her service had been conferred. Id. at 1225. Although the court cited Baer v. Chase, 392 F.3d 609, 622-23 (3rd Cir.2004), which applied a last-rendition test, that case did not involve a communicated refusal to pay, a question reserved in Thompsen, 878 A.2d at 1225 n. 7.
Thus, contrary to the IIC’s contention, District of Columbia law does not establish a last rendition of services test for the accrual of an unjust enrichment claim, and its reliance on August 2003 as the last month in which Vila provided services is misplaced. The IIC’s alternative contention that Vila’s claim accrued prior to October 26th, 2003, pointing to August 4, 2003, the date on which Vila alleges that Regional Head Moscoso acknowledged his work but refused to compensate it, fares no better.
The limitations period on an unjust enrichment claim does not begin until “enrichment becomes unjust,” Thompsen, 878 A.2d at 1223, which is a question of fact for the district court to resolve, Diamond v. Davis, 680 A.2d 364, 370 (D.C.1996). In resolving the question at this stage of the proceedings, the court reviews the district court’s order denying dismissal on limitations grounds de novo, accepting the allegations in the complaint as true, Browning, 292 F.3d at 242, and granting Vila “the benefit of all inferences that can be derived from the facts alleged,” Kowal v. MCI Commc’ns Corp., 16 F.3d 1271, 1276 (D.C.Cir.1994). Contrary to the dissent, Dis. Op. at 290-93, although the complaint does state that the August 4th email from Moscoso “acknowledged his work but refused to compensate it,” Compl. ¶ 14, the district court could find, upon granting Vila the benefit of all reasonable inferences arising from the allegations in his complaint, that enrichment became unjust only on November 4. On that date Alejandra Vallejo, the Coordinator of Institutional Affairs in the Personnel and Administration Office of the IIC, advised Vila, after he had submitted an invoice to the IIC’s General Manager Jacques Rogozinski, that he would not be compensated for his services in the absence of a formal contract. Compl. ¶ 5. That email rejected Vila’s first request for a specific amount of compensation for the various services at issue, after submission of an invoice to a top official and by the office that handles such personnel-related matters. A finding that this email, and not Moscoso’s August 4 email, started the limitations period is further supported by Vila’s allegations that he worked on four different projects in 2003, only two of which involved Moscoso (as indicated by the emails attached to his complaint). Vila’s submission of an invoice to someone at the top of the chain of command, therefore, was the first point in time the IIC would have known the totality of the work — and its costs — that it was being asked to pay; its subsequent refusal was the first unequivocal refusal for all his work that year.
*375 The dissent incorrectly suggests this case is indistinguishable from Thompsen, Dis Op. at 290-93, which held that the plaintiff’s cause of action had accrued no later than the date that the advertising director of The Washington Times advised her she would not be compensated for her work. The facts here, however, are different in material ways. First, Vila worked on four projects for several persons within the IIC, while Thompsen presented only one proposal to the newspaper and her relevant contact was the newspaper’s advertising director, who conveyed to her the newspaper’s decisions about her project. The district court could reason, therefore, that a refusal to compensate by any one of the persons for whom Vila worked would be less final than the refusal that Thompsen received from the advertising director. Second, Vila’s relationship with the IIC was different than Thompsen’s relationship with the newspaper. Although Thompsen could also be described as an independent contractor, Vila had a longer history with the IIC, working on various projects with the IIC for three years prior to 2003, and alleged the services for which he now seeks compensation were requested by several persons at the IIC, unlike the one-on-one relationship in Thompsen where the advertising director was Thompsen’s point of contact on her project. When Vila exchanged emails with Moscoso and Reed concerning compensation, therefore, he might reasonably have anticipated that he could go to their superior, General Manager Rogozinski, if his requests for compensation were rebuffed and that Rogozinski would make the final decision, either directly or through appropriate channels. The emails attached to Vila’s complaint indicate this is what happened, as Rogozinski forwarded Vila’s invoice to the Personnel and Administration Office, which then informed Vila that based on the IIC’s policies it would not be able to compensate him for his services.
This approach does not, as the dissent suggests, create a new rule that limitations periods can be extended with “repeated appeals,” Dis. Op. at 293. Rather, the limitations period on an unjust enrichment claim does not begin until “enrichment becomes unjust.” Thompsen, 878 A.2d at 1223. In resolving this fact-bound question, the district court could find the operative accrual date to be the date of rejection of a contractor’s bill for services, especially when several IIC employees had requested Vila’s services and the presentment and rejection of the invoice was not so far in time from the rendition of the services. Our dissenting colleague would parse individual allegations that support a November 4 accrual date, rather than consider the allegations in their totality, see Dis. Op. at 293-94, and tweak Vila’s allegations and the material distinctions with Thompsen, see, e.g., Dis. Op. at 293, while overlooking that at this stage of the proceedings Vila is entitled to all favorable inferences in determining when the enrichment became unjust. Viewed in their totality, and according Vila all favorable inferences, Vila’s allegations “plausibly give rise to an entitlement to relief,” Ashcroft v. Iqbal, — U.S. -, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009), and we conclude that the district court properly declined to dismiss the complaint as untimely pursuant to Rule 12(b)(6). On remand the IIC can present evidence to support its limitations defense that August 4, 2003 was the actual date of refusal, see Diamond v. Davis, 680 A.2d at 370.
Accordingly, we affirm the order denying the IIC’s motion to dismiss Vila’s unjust enrichment claim pursuant to Rules 12(b)(1) and 12(b)(6), and we remand the ease to the district court.

. On January 26, 2009, the district court denied the IIC’s motion for certification of the limitations issue pursuant to 28 U.S.C. § 1292(b). This court had previously denied the IIC's motion to hold the appeal in abeyance pending the district court’s ruling. Vila v. Inter-Am. Investment Corp., Order No. 08-7042 (D.C.Cir. Oct. 7, 2008).

. See Articles of Agreement of the International Bank For Reconstruction and Development, art. VII, § 3, 27 Dec. 1945, 60 Stat. 1440, T.I.A.S. No. 1502, 2 U.N.T.S. 164, 180; Agreement Establishing the Inter-American Development Bank, art. XI, § 3, Apr. 8, 1959, 10 U.S.T. 3068, 3095; Articles of Agreement of the International Finance Corporation, art. VI, § 3, Dec. 5, 1955, 7 U.S.T. 2197, T.I.A.S. No. 3620.

. We note that although unjust enrichment claims may arise outside of the context of commercial transactions, because waiver of immunity for such claims might not provide a similar corresponding benefit to the organizalion, our holding does not address whether the IIC has waived immunity in contexts that neither involve contract negotiations nor implicate the contract and quasi-contract principles on which the instant case turns.

. The dissent is mistaken when it suggests the court is dismissing, for determinations of immunity, the general costs of litigation, Dis. Op. at 288-89. Atkinson, cited by the dissent, described the costs of litigating wage garnishment suits, noting that the court was '‘skeptical” that such costs would be "minimal.” 156 F.3d at 1339. But because the court in that case determined that garnishment suits would provide "no conceivable benefit” — indeed would constitute a detriment in attracting employees — the court had no need to balance those costs and thus gave no guidance as to what kind of benefit would outweigh them. And, in any event, the litigation costs in Atkinson were costs that "a stranger to the proceedings in which a judgment has been obtained,” who was thus an “innocent third party,” would have to bear to protect his relations with third parties, id. (citing authorities on the burdens of garnishment proceed-tags). Thus, conceivably a greater benefit would be required to outweigh them than to outweigh costs in a suit in which the organization was a direct participant, if for no other reason than that an organization’s exposure to suits stemming entirely from the independent actions of others is completely beyond its own control. But however litigation costs might factor into the balancing test in another case, the IIC has not posited litigation costs distinguishable from those involved in promissory estoppel suits for which the court found a waiver of immunity in Osseiran. See IIC Rule 28(j) Letter, Feb. 10, 2009; Oral Arg. at 14:20-15:48 (attempting to distinguish Osseiran based not on costs, but rather on the lesser benefit that would inure to the IIC as a result of exposure to this type of suit). Just as those costs did not outweigh the benefit to the organization in Osseiran, they do not outweigh the benefit to the IIC here.